**PRESBYTERIAN HOSPITAL NORTH, et al., Appellants,**

**v.**

**TEXAS HEALTH FACILITIES COMMISSION, et al., Appellees.**

No. 13840.

Court of Appeals of Texas, Austin.

Nov. 23, 1983.

Rehearing Denied Jan. 18, 1984.

William D. Darling, Wood, Lucksinger & Epstein, Austin, for appellants.

Mark White, Atty. Gen., Roxanne Caperton, Asst. Atty. Gen., Austin, for Texas Health Facilities Commission.

Dudley D. McCalla, Heath, Davis & McCalla, Austin, for Humana of Tex., Inc. and Medical City Dallas, Ltd.

Alexis J. Fuller, Jr., Davis & Davis, Austin, Attys., for Plano General Hosp.

Before SHANNON, POWERS and BRADY, JJ.

POWERS, Justice.

Presbyterian Hospital North and Presbyterian Medical Center of Dallas, appellants, are non-profit corporations organized and existing under the laws of the State of Texas. They applied jointly to the Texas Health Facilities Commission for a certificate of need that would authorize their construction and operation of a new acute-care general hospital in southwest Collin County, Texas. Tex.Rev.Civ.Stat.Ann. art. 4418h, Texas Health Planning and Development Act, §§ 3.01–3.15 (1976 and Supp. 1982). The Commission consolidated appellants' application with those of five other applicants who had requested similar authority to build and operate hospitals in the same vicinity.[1]  After a contested-case

---

1. The five applicants intended different health-care facilities to be erected and operated under a certificate of need issued by the Commission:

   a.  Appellants intended a facility that would "contain 96 medical-surgical beds" and provide certain specified "support services";

   b.  Brookhaven Medical Center and Farmers Branch Hospital Authority of Farmers Branch, Texas intended the expansion and renovation of an existing medical care facility by replacing 86 beds and adding 14 new beds, so that the remodeled facility would contain "160 medical/surgical beds, 10 ICU [intensive-care unit] beds, and 100 psychiatric beds";

   c.  Carrollton General Hospital and Farmers Branch Hospital Authority of Farmers Branch, Texas intended the construction of "a new 100-bed general acute-care hospital in Carrollton,

hearing, the Commission issued final orders concurrently denying appellants' application and granting certificates of need to each of the other applicants. Appellants sued in a district court of Travis County for judicial review of the Commission's final order denying their application. They now appeal to this Court from a district court judgment that affirms the agency order.[2] Tex.Rev. Civ.Stat.Ann. art. 6252–13a, Texas Administrative Procedure and Texas Register Act (APTRA), §§ 19, 20 (Supp.1982). We will reverse the judgment of the district court and direct that the cause be remanded to the Commission for proceedings consistent with this opinion.

## APPELLANTS' POINT OF ERROR

The Commission's final order contains findings of fact expressed in statutory language, that is, findings of ultimate fact or conclusions of law. The denial of appellants' application rests upon these findings of ultimate fact or conclusions of law. In purported compliance with APTRA § 16(b),

the final order also sets out findings of "underlying fact" to "support" the findings of fact expressed in statutory language. In appellants' view, the findings of underlying fact are not sufficient to support the findings of fact expressed in statutory language, that is, the agency's findings of ultimate fact or conclusions of law. Based upon this asserted insufficiency, appellants charge that the final order is "arbitrary or capricious" and that it requires reversal and remand to the agency because their "substantial rights" have been "prejudiced." APTRA § 19(e)(6). Because we agree with appellants' contentions in this regard, we need not address their remaining points of error.

## THE APPLICABLE REGULATORY STATUTE AND AGENCY RULES

The applicable statutory provisions, as they existed at the time of the Commission's final order, required that appellants obtain from the agency, before constructing

Texas ... to contain 61 medical/surgical, 18 obstetrical, 14 pediatric, and 7 intensive care beds";

d. Presbyterian Hospital of Dallas, not to be confused with either of the appellants, intended construction of a new seven-floor structure "in order to relocate and expand" certain of its existing facilities, and to expand other services in the existing facility, by adding 138 licensed beds, including "91 medical/surgical beds, 29 obstetrical beds, 8 neurological intensive care unit beds and 10 cardiac care unit beds";

e. Humana of Texas, Inc., under the trade name "Medical City Dallas," and Medical City Dallas, Limited, intended renovation of an existing facility and the construction of "a new 7-floor building addition," resulting in the addition of 196 new beds, including "116 medical/surgical beds, 68 obstetrical beds, and 12 CCU [critical care unit] beds"; and

f. Richardson Medical Center/B.B. Owen Memorial Hospital of Richardson, Texas intended renovation of an existing facility and the construction of a new three-floor building addition, resulting in the addition of 126 new beds, including 113 medical and surgical beds, five beds for a combined intensive-care and critical-care unit, and eight psychiatric beds.

2. Appellants' suit in district court challenged only the Commission's action in refusing the certificate of need for which they had applied; they did not seek reversal of the Commission's

action in granting certificates of need to the other five applicants.

The Commission and the Texas Area 5 Health System Agency appeared and answered in appellants' suit. The latter was dismissed from the suit. Four of the successful applicants were permitted to intervene in the district court suit: Humana of Texas, Inc. and Medical City Dallas, Limited; Brookhaven Medical Center; Carrollton General Hospital; and Richardson Medical Center/B.B. Owen Memorial Hospital of Richardson, Texas. Two other parties were permitted to intervene in behalf of the Commission's order: Lewisville Memorial Hospital and Plano General Hospital.

Before trial, the district court consolidated appellants' suit with two related suits pending in the court: Cause No. 324,321, styled "Presbyterian Medical Center of Dallas and Presbyterian Hospital North v. Texas Health Facilities Commission and Farmers Branch Hospital Authority/Carrollton General Hospital"; and Cause No. 324,343, styled "Lewisville Memorial Hospital v. Texas Health Facilities Commission and Farmers Branch Hospital Authority dba Carrollton General Hospital."

On appeal to this Court, briefs have been filed by appellants, the Commission, Humana of Texas, Inc., Plano General Hospital, and "Carrollton General Hospital." The last-named entity has, however, subsequently withdrawn as a party to the appeal.

the proposed hospital, a certificate of need that authorized the work. Texas Health Planning and Development Act, *supra,* §§ 1.03(4), (7), (9), (15), 3.01(a)(2), 3.12. This statute is administered by the Commission and requires the agency to promulgate the criteria by which it shall determine whether to issue such certificates of need. *Id.,* § 3.10(a). While the act does not foreclose the agency's promulgation of other or more specific criteria, the act does specify certain minimum criteria that the Commission *must* establish and apply in making its decision to issue or deny a certificate of need. *Id.,* § 3.10(b).

At the times material to the present case, the Commission had promulgated agency rules that established the following criteria among others:

> [The proposed] project must be necessary to meet the health care requirements of the community or population to be served.
>
> [T]he medical service area for the project must contain sufficient current and future population to require the additional facility.
>
> [T]he project's [sic] approach to providing health care services should be less costly, or more effective or more appropriate than other methods which are available, or which have been approved to be developed.
>
> When a project compares unfavorably with one or more of the criteria against which it is properly measured, the application for a certificate of need may be denied.

Texas Health Facilities Comm., Rules 315.-19.01.010, .020, .030, .050, 3 Tex.Reg. 1362–64 (1978), as amended 4 Tex.Reg. 2949 (1979); now codified as amended at 25 Tex. Admin.Code § 513.1–.21.

In the present case, the Commission denied appellants' application for a certificate of need because the agency determined that the health facility proposed by them failed to meet each of the foregoing criteria.

## THE DECISIONAL PRINCIPLES APPLICABLE ON APPEAL

In our view, the present case is controlled squarely by the principles discussed and applied in our opinion in *Charter Medical-Dallas, Inc. v. Texas Health Facilities Commission,* 656 S.W.2d 928 (Tex.App.1983, writ pending). The final order now under review, issued by the same administrative agency, is invalid for the same vices identified in *Charter Medical*—primarily the vice of attempting to make mere summaries of the evidence do service for the findings of "underlying fact" required by the express terms of APTRA § 16(b). We were informed in oral argument, on submission of the present appeal, that the Commission *routinely* composes its findings of underlying fact as mere summaries of the evidence; and that the agency intentionally does so for the reason that it wishes not to appear "arbitrary" by declaring to be true any particular facts about which there is conflicting evidence. This may or may not be the policy of the agency and the irony is self-evident. In any event, we now review a second appeal where the Commission *has* merely summarized the evidence in purported compliance with the requirements of APTRA § 16(b).

More sobering still is appellees' claim that our decision in *Charter Medical* was unprecedented and ushered in a "new day" in the judicial review of the final orders of administrative agencies. This is incorrect. The principles discussed and applied in *Charter Medical,* relative to findings of fact and conclusions of law made by administrative agencies in contested cases, and to the "substantial evidence rule" as a standard of judicial review, are quite literally "hornbook law" and the elementary principles familiar to all students of basic administrative law. 2 Cooper, State Administrative Law at 465–81 (1965); Davis, Administrative Law Text, §§ 16.01–16.10 (1972). These principles have been applied repeatedly in numerous and unvarying decisions of the Supreme Court of Texas, which decisions we have re-emphasized for the interested practitioner by way of a foot-

note.[3] That these principles are apparently unfamiliar to an important State agency, and that they are attacked at this late date, not on the basis that they are *inapplicable*

3. Section 16(b) of APTRA is not the first Texas statute to require that an administrative agency make findings of fact in the exercise of its quasi-judicial power. Before the enactment of APTRA, and its applicability to most State administrative agencies, two other statutes, the first dealing with the regulation of motor carriers and the second with the regulation of savings and loan associations, required that the administering agency make findings of fact and conclusions of law to support its final orders. The statutory construction placed upon these earlier statutes bears directly upon the proper interpretation to be given APTRA § 16(b), for the principles relied upon by the Supreme Court are fundamental principles as the following analysis makes abundantly clear.

*The Texas Motor Carrier Act*

Among the oldest of the State administrative agencies, the Texas Railroad Commission is an agency of great tradition and wide authority. The Texas law interpreting a statutory requirement for the making of findings of fact developed initially under a statute administered by that agency: Tex.Rev.Civ.Stat.Ann. art. 911b, § 5a(d), the Texas Motor Carrier Act. That section governs the Commission in its issuance of certificates of convenience and necessity to "specialized motor carriers" and provides as follows:

The Commission shall not have authority to grant any application for a certificate of convenience and necessity authorizing operation as a "specialized motor carrier" or any other common carrier unless it is established by substantial evidence (1) that the services and facilities of the existing carriers serving the territory or any part thereof are inadequate; (2) that there exists a public necessity for such service, and (3) the public convenience will be promoted by granting said application. The order of the Commission granting said application and the certificate issued thereunder shall be void unless *the Commission shall set forth in its order full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers, and the public need for the proposed service.* [emphasis added]

In *Thompson v. Hovey Petroleum Co.,* 149 Tex. 554, 236 S.W.2d 491 (1951), the Court reviewed a Commission order granting a specialized-motor-carrier certificate to transport designated chemicals in "tank trucks." The application was protested by existing railroads and motor carriers. The agency order set out the testimony of the witnesses called by the applicant. Their testimony tended to show that the service provided by existing rail lines, in transporting the designated chemicals in "tank cars", was inadequate, and that tank truck service was needed for various reasons. The Commission held the order did not comply with the fact-finding requirements of § 5a(d) because "there

is no finding that these ends cannot be accomplished by use of tank trucks available from existing motor carriers." *Id.* 236 S.W.2d at 496.

In *Thompson v. Railroad Commission,* 150 Tex. 307, 240 S.W.2d 759 (1951), the Court was confronted with agency orders which were "substantially identical with those in the Hovey case," but the Court could not hold the orders void on the precise ground relied upon in *Hovey* because this error had not been assigned by the petitioner railroads. The order contained two kinds of findings. First, the order contained findings that the applicant called witnesses who testified to certain facts, and that the rail lines offered evidence of certain facts. The Court held that these findings were not sufficient to comply with § 5a(d). The Court, quoting with approval from opinions in other jurisdictions, stated:

An order of the Commission must contain more than a mere reference to the evidence. A valid order ... must contain a finding of fact ... upon which the order is founded ....

\* \* \* \* \* \*

Many of the [agency's findings] are preceded by such phrases as 'complainant alleges,' 'complainant's witnesses allege,' 'complainant also points out,' 'it was stated,' 'respondent submits,' 'respondent by its witnesses and in its brief argues,' 'testimony submitted by complainant indicates,' and the like, leaving it uncertain whether the department intended to affirm or disaffirm the matters contained in the recitals following the phrases, or intended the matters merely as argument in support of the conclusions reached. [*Id.* 240 S.W.2d at 762–63.]

The agency order also contained findings that the services and facilities of the existing carriers were inadequate, and that the public convenience would be promoted by granting the application. The Court stated:

*Obviously, that is not a finding of fact, but is only a finding of an ultimate conclusion, partly in the words of the statute.*

We are referred to many authorities from other jurisdictions construing orders of public service commissions under statutes similar to ours. Without exception, so far as our investigation goes, they all hold that a general conclusion like the one copied next above is not a compliance with the statutory requirement that the Commission file findings of fact. [*Id.* at 762.]

In *Texas & New Orleans Railroad Co. v. Railroad Commission,* 155 Tex. 323, 286 S.W.2d 112, 125 (1955), the Court held that a Commission *ratemaking* order could not be invalidated on the basis that it failed to contain a finding that the old rates were unreasonable and a finding that the new rates were reasonable. The Court reasoned that the finding of fact

requirement of art. 911b, § 5a(d) pertained only to orders granting specialized-motor-carrier certificates and not to rate orders.

In *Railroad Commission v. Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815, 825–26 (1958), the Court reviewed a Commission order amending specialized-motor-carrier certificates to authorize the holders to transport large and heavy equipment for sulphur mining. Without elaboration, the Court held that "the order [was] sufficiently specific and definite in its findings of fact and the recitations in such order as to comply with" art. 911b § 5a(d). The order of the Commission was set out by this Court in its opinion at 298 S.W.2d 914, 923–24 (Tex.Civ.App.1956). The order contained findings of fact to the effect that neither rail lines nor regular route common carriers could adequately perform the services authorized by the certificate, because neither could dismantle, load, unload, and install the equipment in question as could the specialized carriers, and that the former carriers would have to hire the specialized carriers to do so for them, causing delay and expense to shippers; because the points of origin and destination were in sulphur fields and off the routes of regular rate common motor carriers and rail lines, etc.

In *Miller v. Railroad Commission,* 363 S.W.2d 244 (Tex.1962) the Court vacated an order of the Commission (granting a specialized-motor-carrier certificate) on the ground that the order failed to set out the findings of fact required by § 5a(d). The Commission found that "the existing specialized motor carrier service is inadequate in that the service is not available when needed, ... that trucks and facilities are not available when needed," and that the proposed service was not rendered by regular route common motor carriers or by rail lines. The Court stated:

> There is purpose in [§ 5a(d)]. One purpose no doubt is to restrain any disposition on the part of the Commission to grant a certificate without a *full consideration of the evidence and a serious appraisal of the facts.* Another is to inform protestants of the facts so that they may intelligently prepare and present an appeal to the courts. Still another is to assist the courts in properly exercising their function of reviewing the order. *If an order is to accomplish these purposes, it must contain findings of basic facts as distinguished from mere factual, or mixed factual and legal, conclusions.* Findings of basic facts cannot be presumed from findings of a conclusional nature.

> \*  \*  \*  \*  \*  \*

> We hold that the findings do not meet the requirements of the statute. The statements that "service is inadequate in that the service is not available when needed" and "trucks and facilities are not available when needed" *do not provide sufficient findings of basic facts from which the courts can determine if*

*reasonable grounds existed for issuance of the order.* This court has neither the right nor the ability to lay out a precise form of findings to be made by the Commission. They should be such that a court upon reading them can fairly and reasonably say that they either do or do not support the required ultimate statutory findings of inadequacy of the services and facilities of existing carriers and a genuine public need for the proposed service.... The sufficiency of findings to meet the requirements of the statute must be related to the issues and the evidence in each case separately. [*Id.* at 245–46.]

In *Alamo Express v. Railroad Commission,* 407 S.W.2d 479 (Tex.1966), the court reviewed a Commission order amending a *common* carrier certificate to authorize the holder to transport goods over a shorter route between Houston and San Antonio, connecting with the carrier's authorized routes west of San Antonio and east of Houston. In addition to its ultimate conclusions of inadequate services, public need, and public convenience, the Commission found that the population, industry, and economy of the cities of Houston and San Antonio had increased and would continue to increase, and that the freight tonnage moving through and between these cities and demands for expedited and improved common carrier service had increased; that the proposed new route was over a much better highway and 78 miles shorter than the applicant's previous route, and its use would provide much safer, improved, and expedited service, and would save the applicant $22,000 a year; that the pickup and delivery service of existing carriers was slow, irregular, and inconsistent; that the amendment would permit the applicant to transport goods directly between points west of San Antonio and east of Houston, without having to change carriers at either city, preventing delays and inconvenience; that granting of the application would have no substantial adverse effect on existing carriers and that any nominal competitive effect on existing carriers was outweighed by the public need and public convenience requiring the service.

The Court held that the fact-finding requirement of § 5a(d) did not apply to the Commission's order granting an application to amend a *common* carrier certificate, but that this order was governed instead by art. 911b § 12(a) which required the Commission to file along with its order "a concise written opinion setting forth the facts and grounds for its action." The Court held that this requirement was satisfied by the Commission order. Moreover, the Court held that "even applying the rule of [*Miller, Thompson,* and *Hovey*—cases in which § 5a(d) *did* apply], the order here in question would not be governed by those decisions." [*Id.* at 485–86.]

In *Morgan Drive Away v. Railroad Commission,* 498 S.W.2d 147 (Tex.1973), the only find-

ings of fact set forth in the order to support the conclusion that the service and facilities of existing carriers were inadequate, were contained in the following paragraphs:

> Virtually all of applicant's public witnesses complain of a lack of equipment availability from protestants ... The public witness testimony includes specific testimony regarding instances wherein protestants have been unable to supply appropriate equipment when and as needed for the movement of traffic ... The evidence further indicates that in some instances protestants have relied upon foreign-based power units, not properly registered with the ... Commission, for the handling of intrastate traffic ..., contrary to the Commission's regulations.
>
> In consideration of the above, the Examiner [whose report was adopted by the Commission] concludes that protestants are not providing a fully adequate service .... Applicant has established by substantial evidence that the service proposed is required by the public convenience and necessity, and has established further that the services it proposes will result in a material improvement in existing transportation service. [*Id.* at 151.]

The Court stated:

> We recognized in [*Miller*] that assistance to the Courts in exercising their function of reviewing [agency] orders is a statutory function of the fact finding requirement, and that the sufficiency of findings to meet the requirements of the statute must be related to the issues and the evidence in each case separately. *This is but to recognize the logic that determination of the validity* vel non *of an administrative order under the precepts of the substantial evidence rule should be made in the light of the findings of fact upon which the order of the Commission is predicated* ....
>
> It is ... clear that the conclusions in the second of the two quoted paragraphs do not qualify as fact findings under the rationale of *Miller*, ... where we held that [similar] statements ... do not *provide sufficient findings of basic facts from which the Court can determine if reasonable grounds existed for issuance of the order;* as well as under the rationale of *Thompson*, ... where similar statements were recognized as no more than a finding of an ultimate conclusion, partly in the words of the statute.
>
> Each of [the] three sentences [in the first quoted paragraph] is no more than a reference to the evidence with no stated findings of fact .... Even [as a finding of fact, the last sentence] implies no more than an adverse criticism of the actions of the protesting carriers "in some instances." ...
>
> Appellees say, however, that the first sentence in the next succeeding paragraph [which begins "in consideration of the above, the examiner concludes ..."] converts the foregoing into acceptable and sufficient findings of fact .... It may well be that the Commission relied upon the recited evidence in reaching its conclusions; but there are no findings of fact pertaining to what may have been "included" in the public witness testimony, or to any inadequacies in the existing services. Quite clearly, there are no findings of fact that are full and complete in pointing out such inadequacies in detail.... *Were we to reach the substantial evidence point, we would look in vain for findings to test against the evidence in such respects.* [*Id.* at 150–52; emphasis added.]

In *Auto Convoy Co. v. Railroad Commission*, 507 S.W.2d 718 (Tex.1974), the Commission granted a specialized-motor-carrier certificate authorizing the transport of used automobiles and pickup trucks to and from Grand Prairie, where auctions of such vehicles were held, one for late-model used vehicles and another later in the day for older used vehicles. The Commission found that existing services for transporting the older cars to and from the appropriate auction were inadequate because shippers "are being forced to use tow bars and illegal carriers to transport their vehicles at the present time." The Commission further found that existing services for transporting the newer used cars to and from the appropriate auction were also inadequate; that several specific witnesses had been unable to obtain service without seven to ten-day delays on several occasions; that such delays caused loss of revenue to these shippers and were unreasonable; that the proposed service was needed and would cause more prompt movement of the newer used cars and reduce the losses in revenues caused by delays; and that limitation of the certificate to authorize transportation of only the newer used cars would be impractical, difficult to police and enforce and, therefore, administratively undesirable and unduly burdensome to the sellers who auction both the new and older used cars at the same place on the same day.

The Court held that these findings satisfied § 5a(d):

> These findings are clear and explicit. They point out in sufficient detail the inadequacies of the services and facilities of the existing carriers and the public need for the proposed service. The findings are not couched in terms other than as findings; neither are they mere conclusions, references to, recitals or summation of the evidence, or otherwise insufficient for reasons set forth in [*Morgan Drive Away, Miller, Thompson,* and *Hovey*]. On the contrary, they are findings upon the material issues to be reviewed and tested under the substantial evidence rule. [*Id.* at 721.]

*The Texas Savings And Loan Act*

Another pre-APTRA statutory fact-finding requirement is found in the Texas Savings and

Loan Act (TSLA), Tex.Rev.Civ.Stat.Ann. art. 852a (1964). TSLA § 2.08 provides that the Savings and Loan Commissioner shall not approve any charter application unless he affirmatively finds that (1) the applicant has complied with certain designated provisions of the Act; (2) the character, responsibility and general fitness of the persons named in the articles of incorporation of proposed association are such as to command confidence and warrant belief that the business of the proposed association will be honestly and efficiently conducted in accordance with the intent and purpose of the Act, and that the proposed association will have qualified full time management; (3) there is a public need for the proposed association and the volume of business in the community in which the proposed association will conduct its business is such as to indicate profitable operation; (4) the operation of the proposed association will not unduly harm any existing association.

The agency has promulgated rules providing that the Commission shall approve an application for a branch office if he makes certain affirmative findings. Several of these required findings are simply those which § 2.08 requires the Commissioner to make. The other findings required by the rules are that (1) the aggregate amount of the loss reserves, surplus, and permanent reserve fund stock, if any, of the applying association is equal to three (3%) of its savings liability; (2) the applying association has had a profitable operation for the three year period next preceding the filing of such application; (3) the applying association has had no serious supervisory problems which would affect its ability to operate such office properly; (4) a separate enclosed office area will be provided; and (5) a proposed branch office will be located in the same county or metropolitan area as the home office *or no association is adequately serving the community* where the branch office is proposed to be located. TSLA § 11.11(4) provides, in language very similar to that contained in APTRA § 16(b):

> A decision or order adverse to a party who has appeared and participated in a hearing shall be in writing and shall include findings of fact and conclusions of law, separately stated, on all issues material to the decision reached. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

In *Lewis v. Gonzales County Savings and Loan Ass'n*, 474 S.W.2d 453 (Tex.1971), the Commissioner had made all the requisite findings of fact necessary to his approval of a branch office application, that is, those findings mandated by TSLA § 2.08 as well as those findings mandated by the rules promulgated by the agency. *None* of the findings were accompanied by a statement of the underlying facts also

determined by the Commissioner and which might support the findings expressed in terms of the statute and the rules. The Court held the Commissioner's order invalid because there were no findings of underlying facts to support the statutory criteria, that is, those stated in § 2.08 of TSLA. Notwithstanding that this holding was entirely sufficient to support the Court's decision, the Court proceeded by way of obiter dicta to consider whether the findings required by, and expressed in terms of, the agency's rules were also required to be supported by a statement of the underlying facts found by the Commissioner. On this point, the Court stated broadly:

> We are of the view that this requirement applies only to findings of fact in the Commissioner's orders which are "set forth in statutory language." When findings are made in the language of the rules and regulations that do not embody statutory language, they need not be accompanied by a concise and explicit statement of the underlying facts. [*Id.* at 457.]

The Court then held that four of the findings required by the rules were "set forth in statutory language." These findings contained language similar or identical to that found in TSLA § 2.08. The court explained:

> The remaining findings are in the language of the Rules and Regulations rather than the statutes. These findings are largely of a factual nature capable of precise, objective measurement. They include and carry with them the supporting underlying facts. These underlying facts either exist or they do not. There is no real need for findings of this nature to be supported by a more concise statement of the underlying facts. These factual matters can be readily measured against the record by reference to a financial statement or a few lines of testimony. On the other hand, the Rules and Regulations contemplate a number of findings be expressed in statutory language. *These findings require discretion or judgment on the part of the Commissioner that are based on a multitude of factors. These are the findings which must be accompanied by concise and explicit statements of the underlying supporting facts.* [*Id.* at 457; emphasis added].

We think that by this language the Supreme Court of Texas held that findings of fact "which require discretion or judgment ... based on a multitude of factors" are findings "set forth in statutory language" and must be accompanied by a statement of underlying facts supporting them, regardless of whether the language of the finding corresponds to a statutory or a rule-based standard. Findings are *not* "set forth in statutory language" and need not be accompanied by a statement of supporting underlying facts when they are "of a factual nature" and "can be readily measured against the record," regardless of whether the language of the finding corresponds to a statutory or rule-based standard. Our conclusion is

supported by the fact that both TSLA § 11.-11(4) and APTRA § 16(b) were taken virtually *verbatim* from § 12 of the Model State Administrative Procedure Act, and the comment to this section of the Model Act states that "an attempt is here made to require the agency to go beyond a mere statement of a general conclusion in the statutory language ... *or in language of similar generality*." (emphasis added). Also, if findings of fact stating a legal or normative conclusion need not be supported by findings of basic fact, merely because the legal standard involved is not statutory, an agency could easily frustrate effective review of its decisions merely by basing its decisions on regulatory as opposed to statutory standards. Regulatory statutes often do not exclusively specify the ultimate standards for agency action, but rather leave this up to the agency; sometimes the statutes do not specify *any* of the ultimate standards for agency action. *See, e.g.* Texas Health Planning and Development Act § 3.10; Tex.Water Code §§ 26.023, 26.027 (Supp.1982).

In *Bay City Federal Savings and Loan Ass'n v. Lewis,* 474 S.W.2d 459 (Tex.1971), the Court held that under TSLA § 11.11(4) the agency order is invalid where findings made in statutory language are not accompanied by a statement of the underlying facts supporting the findings, even though the finding of ultimate fact was not disputed in the agency hearing, and even though the appellants do not contend that the ultimate findings were not supported by substantial evidence. In *Lewis v. Jacksonville Building and Loan Ass'n,* 540 S.W.2d 307 (Tex.1976), and *Lewis v. Nacogdoches Savings and Loan,* 540 S.W.2d 313 (Tex.1976), the Court held that the agency orders under review, approving charter applications, complied with the requirements of TSLA § 11.11(4). However, the Court did not explain this conclusion and neither the opinions of the Court nor those of the Court of Civil Appeals describe any of the findings of fact. Therefore, these opinions provide no guidance on the proper interpretation of TSLA § 11.11(4) or APTRA § 16(b).

### Texas Administrative Procedure And Texas Register Act

We now reach the decisions of the Supreme Court of Texas construing APTRA § 16(b). In *Imperial American Resources Fund v. Railroad Commission,* 557 S.W.2d 280 (Tex.1977), the Supreme Court reviewed the Commission's order granting a permit to drill a gas well, closer to the property line than permitted under the Commission's spacing rules. The Commission concluded in its final order that the permit was necessary to give the lessee a reasonable opportunity to recover the hydrocarbons underlying its lease, to protect the lessee's correlative rights, and to prevent confiscation of its property. The court held that the Commission's order did not violate APTRA § 16(b).

The Commission found that a well previously drilled on the lease was incapable of production sufficient to allow recovery of hydrocarbons underlying the lease; that producing wells drained the lease from every direction, with good producing wells to the north and east; that the lease was suffering net uncompensated drainage; that the proposed drilling site was a reasonable location in an area of better productivity, affording the lessee a reasonable opportunity to recover the hydrocarbons underlying the lease; and that a well could be drilled on a site permitted by the Commission's spacing rules at a certain depth but this site would be in the direction of poorly producing wells and would not afford the lessee a reasonable opportunity to produce the hydrocarbons underlying the lease because of lower production rates. In holding these findings of fact sufficient, the Court closely tracked its language in *Auto Convoy:*

> We have carefully examined these findings and tested them against the more stringent requirements of Article 911b, Sec. 5a(d) ... and Article 852a, Sec. 11.11(4) ... and decisions thereunder ... [The Court then sets out *verbatim* the language from *Auto Convoy* which we have set out previously].
>
> The findings are not set forth in statutory language, and therefore it is not required that they be accompanied by a concise and explicit statement of the underlying facts supporting the findings. While some of the findings might be more artfully worded, they are substantially as would be expected from a trial judge or a jury in answer to controlling rather than incidental fact issues. [557 S.W.2d at 285–86.]

In *Railroad Commission v. Graford Oil Corp.,* 557 S.W.2d 946 (Tex.1977), the Supreme Court invalidated a Commission "proration" order regulating gas-well production, doing so on the ground that the Commission lacked statutory authority to issue the order. The Court construed the statute to authorize the Commission merely to prorate and regulate gas production from individual "common reservoirs" of gas, i.e. common pools or common accumulations of gas in natural communication with each other, and not to regulate and prorate production from multiple common reservoirs jointly. Having thus construed the statute, the Court invalidated the order on the ground that the findings of fact did not include a finding that the requested area *was* a single common reservoir, but rather showed that the regulated area was composed of several common reservoirs. The Court adopted as the test under APTRA § 16(b) the same test that the Court had announced in *Miller* under art. 911b § 5a(d): "[t]he findings should be such that a court, on reading them, could fairly and reasonably say that they support the ultimate findings of fact required for its decision." 557 S.W.2d at 950. In *Gage v. Railroad Commission,* 582 S.W.2d 410 (Tex.1979), the Court was faced with a

but on the basis that they are *unprecedented,* suggests the necessity of such re-emphasis and the desirability of summarizing them once again before we apply them to the findings of fact made by the Commission in the present case.

proration order similar to that invalidated in *Graford,* except that the *Gage* order contained a finding that the regulated area *was* a "common source of supply." The Court held that this finding was set forth in statutory language and was therefore required by APTRA § 16(b) *to be accompanied by a concise and explicit* statement of the underlying facts supporting it. The Court reiterated the tests enunciated in *Imperial American* and *Graford.* Holding that the findings of fact did not support the ultimate finding that the regulated area constituted a single "common reservoir" or "common source of supply" but established the contrary instead, the Court invalidated the order.

Finally, in *Railroad Commission v. Entex,* 599 S.W.2d 292 (Tex.1980), the Court considered a Commission gas-utility rate order providing for a four-percent rate of return on the utility's adjusted-value rate base. The Court reiterated the test for sufficiency of findings of fact stated in *Graford.* The Court impliedly found that the *order was supported by sufficient findings of* fact. The primary finding supporting the four percent rate of return on the adjusted-value rate base was that this rate of return would produce a 17.6% rate of return to "book common equity" calculated on the basis of original cost less depreciation.

We are convinced that the principles which we have set out in *Charter Medical* and discussed in this case are amply supported by these Supreme Court cases. First, we note that although the court in *Imperial American* indicated that the requirements of art. 911b § 5a(d) and TSLA § 11.11(4) were somehow "more stringent" than the requirements of APTRA § 16(b), in fact the Court in *Graford* subsequently adopted for APTRA § 16(b) the same test which it had stated in *Miller* for art. 911b § 5a(d). Second, as we have explained above, we think that the Supreme Court requires *all* findings of ultimate fact to be fully supported by findings of underlying fact. Third, the Court in *Morgan Drive Away* recognized that the substantial-evidence rule governs review of the inference of basic facts drawn from the evidence, and not the review of any inference of ultimate facts from basic facts. Fourth, we think that it is *not sufficient* for an agency merely to list various findings of basic fact which give *some* support to its findings of ultimate fact, without making sufficient findings of basic fact to disclose that these facts *reasonably require the finding of* ultimate fact *even though* other basic facts give some support to a *contrary* finding of ultimate fact. While an agency need not state reasons for refusing to

As mentioned previously, APTRA § 16(b) requires that the final orders issued by administrative agencies contain findings of "underlying facts" when the order would otherwise rest upon findings of fact expressed merely "in statutory language."

find certain *basic* facts, even though evidence is offered to support such findings, this rule does *not* permit the agency similarly to disregard *uncontroverted* basic facts. Our previous decisions in *State Banking Board v. Valley National Bank,* 604 S.W.2d 415 (Tex.Civ.App.1980, writ ref'd n.r.e.), *Valley Federal Savings & Loan Ass'n v. Vandygriff,* 609 S.W.2d 605 (Tex.Civ.App.1980, no writ), *Apollo Transports, Inc. v. Railroad Commission,* 610 S.W.2d 872 (Tex.Civ.App.1981, no writ), and *Community Savings & Loan Ass'n v. Vandygriff,* 630 S.W.2d 457 (Tex.App.1982, no writ) must be understood in this manner. In *Miller* the Supreme Court required that the agency order "provide sufficient findings of basic facts from which the courts can determine if reasonable grounds existed for" the agency's findings of ultimate fact, *and to insure that the agency made "a serious appraisal of the facts."* Obviously neither of these requirements is satisfied if the agency merely lists findings of basic fact supporting the finding of ultimate fact without findings of fact explaining why these basic facts outweigh other uncontroverted basic facts which support a contrary finding of ultimate fact. For example, in *Morgan Drive Away,* the Court held that the finding that existing carriers used unauthorized power units, though possibly giving *some* support to the Commission's finding of ultimate fact that their services were inadequate, did not support it to such an extent that it could be deemed *reasonable* in the face of findings of basic facts supporting a contrary conclusion. And in *Hovey Petroleum,* the court held that findings that rail line tank car services were inadequate in various specific respects, while certainly giving *some* support to the Commission's ultimate finding that the services of existing carriers were inadequate, could not make this conclusion reasonable because it was not supported by *other* findings of basic fact showing that existing motor carrier tank *truck* services were inadequate to meet the need in question. In *none* of the cases where the Supreme Court held the agency findings of fact to be sufficient under the applicable statute, does it appear that an appellant contended: (1) that the agency found, or that the evidence conclusively established, basic facts which supported a finding of ultimate or intermediate fact *contrary* to that set forth in the agency's final order; and (2) that the order was invalid because it omitted to set forth *additional* findings which demonstrated that these contrary basic facts were outweighed by those basic facts which support the ultimate or intermediate fact in question.

Findings of "underlying fact" are often referred to as "findings of basic fact"; findings expressed "in statutory language" are often referred to as "findings of ultimate fact" or conclusions of law stated in the factual terms employed in a statute governing agency decisions. *See* Cooper, *supra.* While findings of basic fact are inferred by the agency from the evidence adduced in the contested case, findings of ultimate fact or conclusions of law expressed in factual terms are inferred from the findings of basic fact *previously* made by the agency. The reasoning may not be reversed, that is, "findings of basic fact *cannot be presumed* from findings of a conclusional nature." *Morgan Drive Away v. Railroad Commission,* 498 S.W.2d 147, 148–49 (Tex.1973) (emphasis added).

The statutory requirement for findings of basic fact is not a mere formality. The purposes which lie behind the requirement go to the very essence of the quasi-judicial power exercised by administrative agencies and the judicial review of their decisions. Those purposes are as follows:

(1) to ensure that an administrative agency, in its adjudication of successive contested cases, arrives at a precise meaning to be assigned the broad and abstract legal standards which govern its actions, such as those standards expressed in statutes administered by the agency, in order that those standards may be applied with exactness and consistency;

(2) to compel the agency to ascertain the policies intended to be effectuated by such legal standards; and to consider, directly and fully, how and if those policies are implicated in the facts of a particular contested case, by any action intended by the agency therein, so that agency actions in the end will not be taken in a purely intuitive and necessarily inconsistent manner;

(3) to apprise the parties of the grounds for the agency's decision in a particular contested case in order that they might fairly formulate, prepare for, and join issue on the points in dispute between them, whether in a motion for rehearing in the agency or in any subsequent suit for judicial review of the agency's final order; and

(4) to enable a reviewing court to apply properly all the applicable standards for judicial review, whether those contained in APTRA § 19(e) or those contained in a constitutive statute applicable to the particular case alone. *Miller v. Railroad Commission, supra* note 3; 2 Cooper, *supra.*

It is for the agency, and not the courts, to determine in the first instance the precise meaning to be assigned the abstract legal standards contained in a statute that the agency is required to administer—for example those standards the Commission is required to administer by the terms of the Texas Health Planning and Development Act. It is therefore the task of that agency to determine in the first instance what precise sets of factual circumstances warrant the legal conclusions the agency is required to draw before it takes an action authorized by the statute; for example, before issuing a certificate of need, the Commission must settle upon and declare the precise sets of factual circumstances that enable it to conclude (a) that a proposed facility is "necessary to meet the health care needs of the community or population to be served"; (b) that it "can be adequately staffed and operated" on its completion; (c) that it is "economically feasible"; and so forth. Texas Health Planning and Development Act, *supra,* § 3.10(b).

These tasks are placed initially upon the agency because *it* is charged by the Legislature to administer the applicable regulatory statute. The agency is in a far better position than a reviewing court to know: (a) the policies which underlie the broad and abstract legal standards contained in a statute; (b) when and how those policies are implicated in a given set of factual circumstances by any particular agency action that might be taken in those circumstances; (c) what legal conclusions are required to implement those policies; and (d) if any accommodation or adjustment of conflicting policies is required in the circumstances, what legal conclusions and agency actions

will best be suited to effectuate the policies *and* the accommodation or adjustment.

█ For the foregoing reasons, it is absolutely essential that the agency, in a contested case, make findings of underlying or basic fact which demonstrate the logic that supports the agency's corollary findings of intermediate or ultimate fact.[4] If the agency makes *only* findings of ultimate or intermediate fact, conclusions of law really, without also making findings of basic or underlying fact to support them, the agency's final order provides no guidance whatever with respect to the proper interpretation to be placed upon a legal standard implicated by the agency's findings of ultimate or intermediate fact. The very purposes of APTRA § 16(b) are nullified if that is not done.[5]

█ Similarly, when the agency's final order sets forth, as purported findings of basic fact, only the undeterminative and somewhat pretentious statements that particular witnesses *testified* to certain facts or opinions they may have, the agency has totally abdicated its statutory function and duty to assign meaning to the ultimate legal standards by which its actions are to be reviewed and judged. From findings of that character, one cannot ascertain the precise set of basic facts which the agency settled upon as being true and with respect to which the agency made its determinative legal conclusions or findings of ultimate fact. The impossibility of doing so results because one is unable to identify *which*, if any, of the factual propositions, found or

implied in the mass of conflicting testimony and documentary evidence, were those actually held to be true and from which the agency inferred the correctness of the findings of ultimate fact expressed in its final order. *Thompson v. Railroad Commission*, 150 Tex. 307, 240 S.W.2d 759, 761–63 (1951). The following paragraph may be instructive:

> Sometimes, apparently seeking to avoid the hard work and the necessity of disciplined weighing of the testimony that is required in making definite findings on all the relevant basic facts, an agency merely summarizes the testimony of all the witnesses, and then (implying that the testimony in ways not particularized supports its conclusions) set forth the ultimate conclusions of fact and law in statutory language. The courts agree that this is not a sufficient compliance with the mandate to make findings of fact.

2 Cooper, *supra,* at 478.

█ The judicial review provisions of APTRA illustrate the absurdity of attempting to review an agency final order that recites as "findings of fact" simply the testimony given by witnesses in the contested case, and no more. Under APTRA § 19(e)(6), for example, the reviewing court is required to evaluate the reasonableness of the agency's legal or normative conclusions, that is, its findings of ultimate or intermediate fact. This may *only* be done in reference to a set of basic facts which the

---

4. As we stated in *Charter Medical, supra,* findings of basic fact are purely descriptive or predictive statements which do not embody any normative or evaluative judgment. Findings of intermediate and ultimate fact are essentially conclusions of law and do embody a normative judgment with respect to certain basic facts. Findings of ultimate fact are conclusions of law which apply the broadest legal standard or standards which govern the agency action. Findings of intermediate fact are conclusions of law which apply legal standards which are *specifications* of other more general legal standards. The legal standards involved may be statutory, contained in a formally promulgated regulation, or they may be mere specifications of a broader legal standard, an-

nounced in an agency adjudication applying the broader legal standard. 656 S.W.2d at 934–35.

5. Of course, an agency confines its discretion and promotes consistency in some degree when it promulgates legal standards that are somewhat more specific than the broadest legal standards which govern its action, and in a particular contested case makes corresponding findings of *intermediate* fact. However, this is not enough standing alone. While agencies often cannot promulgate rules that are at once very specific and yet universally applicable in the specific circumstances stated in the rule, the agency must *at least* state the basic facts from which it draws a particular legal conclusion in a particular contested case.

agency has settled upon and declared to be true under the evidence adduced. Or, under APTRA § 19(e)(5), the reviewing court may be required to ascertain from the testimony and documents introduced in evidence whether there is substantial evidence to support the basic facts the agency settled upon as being true and therefore supportive of its findings of ultimate or intermediate fact. But unless the basic facts are *stated,* how may it be determined whether they are supported by "substantial evidence?"[6]

Therefore, whether the agency fails entirely to make findings of basic fact, or whether it rests its legal conclusions solely upon "findings of fact" that are mere summaries of the evidence, the result is the same. The agency, when it defends a final order of that character, is simply asking the reviewing court to uphold the order if the *reviewing court* is able to imagine *any* set of basic facts, suggested by the mass of the evidence and assumed to be true, which might justify the agency's legal conclusions or its findings of ultimate or intermediate fact. As we have stated, however, courts lack the expertise to know what such a set of facts might be and, more importantly, the Legislature has for obvious reasons placed that task upon the agency that hears the evidence and possesses the requisite experience and special knowledge.

Appellees contend that the Commission's final order in the present case *does,* in effect and by implication, select certain factual propositions and deem them true because the order lists the agency's summaries of the evidence under the heading "Findings of Fact" and states that the agency's findings of ultimate fact were determined "because" of the "Findings of Fact" so listed, even if they are only summaries of the evidence; and among those "Findings of Fact" are summaries of the evidence which support the agency's findings of ultimate fact. This argument has very little weight indeed. Were we to adopt such reasoning, we would, for example, be bound equally to the summaries of *contrary* evidence *also* listed under the heading "Findings of Fact" and the agency's declaration that its findings of ultimate fact were determined "because" of *them.* Such reasoning is sterile. It produces only a deadlock in the findings of fact so that the order makes no resolution at all in the parties' contest about the facts of the case, upon which should rest the agency's conclusions of law or findings of ultimate fact.

Second, appellees argue that we may *presume from the result* in the case, or the Commission's findings of ultimate fact, that the agency adopted those particular summaries of the evidence which support the final result and that the agency rejected all other summaries of the evidence listed in the final order under the heading "Findings of Fact." This suggestion requires, of course, a reversal in the functions of findings of ultimate fact and findings of basic

6. The substantial-evidence rule is *not* the test for measuring the reasonableness of the inferences drawn from basic facts and expressed as intermediate or ultimate facts. It is only in a *derivative* sense that one can say that an order or a finding of intermediate or ultimate fact is or is not "supported by substantial evidence"; they are supported by substantial evidence if and only if the findings of basic fact which support them are supported by substantial evidence. *Charter Medical,* 656 S.W.2d at 936.

At the same time, we must emphasize that if the agency's findings of ultimate fact are sufficiently supported by findings of basic fact, the mere fact that the order identifies the *evidence* which supports these findings or contains recitals of testimony does not invalidate the order. *Mutual Building & Loan Ass'n v. Lewis,* 572 S.W.2d 771, 777 (Tex.Civ.App.1978, no writ). Such references to the agency record are help-ful if not essential to efficient judicial review of a contention that a finding of *basic* fact is not supported by substantial evidence.

In *Charter Medical,* we cited *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) for the rule that the test for measuring the validity of findings of *ultimate* fact or *intermediate* fact is whether such findings are "based on a consideration of the relevant factors and whether there has been a clear error of judgment." In doing so, we did not substitute the "clearly erroneous" standard for the "substantial evidence" standard of review of findings of *basic* fact. We held instead, and quite specifically, that the "substantial evidence" rule applies *only* to govern the review of findings of *basic* fact—it is only then that the question arises whether the *evidence* is sufficient to support a finding of *fact.* 656 S.W.2d at 936–37.

fact, so that truth is drawn not from the inherent nature of facts adduced—instead, the attribute of truth is *assigned* arbitrarily to given facts as necessary to support a result reached in a purely subjective manner. This is the opposite of reasoned decision making and the very purposes which underlie APTRA § 16(b) are nullified as a result. In any event, the Supreme Court of Texas rejected in *Morgan Drive Away v. Railroad Commission, supra,* an argument almost identical to that advanced by appellees, saying:

> We may consider only what was written by the Commission in its order, and we must measure its statutory sufficiency by what it says. That is the teaching of *Miller, Hovey, Thompson, supra;* and cf. *Alamo Express, Inc. v. Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815 (1958). The orders in *Hovey* and *Thompson* contained exhaustive summations of the evidence *and it could have been inferred that the Commission subjectively relied thereon in the approval orders.* But *Thompson* stands for the propositions that to be valid an order must contain more than references to the testimony of witnesses or to what their testimony may have included; and that summaries of the evidence are not findings of fact. *Miller* says further that findings of basic facts *cannot be presumed from findings of a conclusional nature.*

498 S.W.2d at 152 (emphasis supplied). We may not make the inferences suggested by appellees; we may measure the sufficiency of the Commission's order, as against the requirement of APTRA § 16(b), only by what the order says.

Bearing in mind the foregoing principles, we turn to a discussion of whether any of the Commission's findings of ultimate fact, expressed in statutory language, are supported by findings of basic fact recited in the agency's final order.

## COMMUNITY HEALTH CARE REQUIREMENTS

■ The criterion applied by the Commission was derived from § 3.10(b) of the Texas Health Planning and Department Act and the agency's former rule 315.19.01.-020, both of which are in almost identical language. The rule provides:

> .020 Community Health Care Requirements. The project must be necessary to meet the health care requirements of the community or population to be served.

The Commission found that "the proposed project is not necessary to meet the health care requirements of the Medical Service area because of the following Findings of Fact." The final order then lists 147 purported "findings of fact." It is suggested that these "findings of fact" support the finding of ultimate fact. The 147 "findings of fact" may be categorized and summarized as follows:

1. The first 91 are *identical* to the first 91 "findings of fact" listed under the heading "Community Health Care Requirements" in those final orders wherein the Commission determined that the proposed project *was* necessary to meet the health care requirements in the community or population to be served, and wherein the agency *issued* certificates of need in the consolidated proceedings.[7]

7. Finding number one states that the applicants' project is one of six proposed to be located in Dallas, Collin or Denton County. Findings two through eight state the current and projected populations of Dallas, Collin and Denton Counties and Texas Health Systems Agency Area Five, according to three specified sources. Findings ten and eleven set out the number of licensed beds operating, under construction, and proposed for each county, broken down according to the service for which the bed is utilized (medical/surgical; intensive care; obstetrical; psychiatric; pediatric), and the ratio of the number of licensed beds to population. Findings twelve through thirty-five set out the results of a survey conducted and compiled by certain state agencies. They take the number of patients residing in each county who were admitted to hospitals, and break that number down according to the particular hospital to which the patient was admitted and the particular service for which the patient was admitted. Findings thirty-six through thirty-eight state the number of patients admitted *in* Dallas County according to hospital and service. Findings thirty-nine through sixty-four examine the admission patterns of each of the four applicants who oper-

2. "Findings of fact" numbered 92 through 135 essentially set out the testimony adduced in *support* of appellants' application and its position that there existed a need for their proposed facility in the community to be served.[8]

ate existing hospitals, setting out the number and percentage of patients admitted to each hospital from areas having particular zip codes within Dallas County, from Dallas County, from Denton and Collin Counties, from other counties in Health Service Area 5, from other Health Service Areas in the State, and from outside the State. Findings sixty-five through seventy-three set out the number of "patient days" (number of beds times number of days) available, utilized, and not utilized, and the percentage of occupancy, at each of eight hospitals in Dallas County and for Dallas County as a whole, all for the year 1977. Findings of fact seventy-four through eighty-one set out the growth in the number of patient days used at eac of the eight Dallas County hospitals, and for Dallas County as a whole, for each of four services (medical/surgical, obstetrical, intensive care/critical care, psychiatric), for the years 1977 to 1979. Finding eighty-two lists proposed projects recently approved or pending before the Commission for Dallas, Collin and Denton counties. Findings eighty-three through ninety set out some of the contents of a document entitled the "Medical Facilities Planning Annex" to the 1980 Texas State Health Plan and the 1980 Texas Area 5 Health Systems Plan, including the "service trade areas" designated therein for various services, and the number of "beds to be added" designated therein for each service area for each service. Finding of fact ninety-one sets out the total number of registered nurses, the number of such nurses employed in nursing, the number employed in other fields, the number of unemployed nurses, the number of such nurses seeking employment, and the number of such nurses *not* seeking employment, in Dallas, Collin, and Denton Counties.

8. The "findings" are as follows:

(92) Presbyterian Hospital North (hereinafter referred to as "PHN") seeks a Certificate of Need to construct a 96-bed, 98,775 square foot acute care medical/surgical general hospital.

(93) According to Mr. Wright, the first floor with 48,400 square feet would include support and ancillary services: dietary, maintenance and central plant, central stores and central supply, pharmacy, surgery, laboratories, physical therapy, respiratory therapy, EKG, administrative, emergency, and radiology.

(94) According to Mr. Wright, the second, third and fourth floors, with 16,125 square feet per floor, would each be a 32 bed nursing unit with a central nursing station.

(95) According to Mr. Wright, the mechanical/elevator and penthouse would be located on the roof of the facility in 2,000 square feet.

(96) According to Mr. Hawthorne, PHN is a non-profit corporation in the State of Texas.

(97) According to Mr. Hawthorne, a hospital benefactor donated 20+ acres of land in the City of Dallas, Collin County to Presbyterian Medical Center (PMC) for the development of a satellite hospital.

(98) According to Mr. Hawthorne, the Board of Directors of PMC has authorized the transfer of his property to PHN at the time a Certificate of Need would be obtained for the construction of PHN.

(99) According to Mr. Hawthorne, the land is zoned special purpose for a hospital facility by the City Planning Commission of the City Council of the City of Dallas.

(100) According to Mr. Wright, water and sewer is available in the area and is being extended to the property line; utilities would be brought to the PHN property line; and there is money in the construction budget to extend it from the property line to the central plant.

(101) According to Mr. Wright, the proposed project site is located on the east side of the extension of the Dallas North Tollway, just north of Frankford Road and south of what will be Loop 190 as proposed by the Texas Highway Department.

(102) Mr. Wright estimated that 24 months would be required for construction of PHN.

(103) According to Mr. Hawthorne, in the long range plan for the 20+ acre PHN campus, a medical office building and a nursing home facility are planned.

(104) In Mr. Hawthorne's opinion, it is the philosophy of Presbyterian Hospital to provide comprehensive health services.

(105) According to Mr. Hawthorne and Mr. Chamness, Presbyterian Medical Center has the following affiliate corporations: Presbyterian Professional Buildings, Presbyterian Hospital of Kaufman, Presbyterian Hospital of Dallas (PHD), Presbyterian Village North, Presbyterian Village North Health Services, and General Health Services Corporation.

(106) In Mr. Hawthorne's opinion, in the network that is developed, PMC affiliates are effectively supported by the "flagship" PHD through shared service programs, the ability to purchase on a large scale, the provision of expertise through personnel which would not normally be available to other smaller institutions or to perhaps a freestanding nursing facility.

(107) In Mr. Hawthorne's opinion, PMC feels such a network is cost effective and would intend to do the same thing with PHN where PMC affiliates would share services, provide services and so forth.

(108) In Mr. Hawthorne's opinion, in establishing a network it is to the patients' advantage to be able to have a primary care facility where they can get that type of service immediately and rapidly and allow the major or tertiary care facility to provide the more sophisticated services that the smaller institution cannot provide.

(109) In Dr. Warner's opinion, the medical service area defined by Mr. Ashworth contains fourteen complete 1980 census tracts, including: 136.01, 136.04, 136.05, 136.06, 136.07, 136.08, 136.09, 136.10, 137.04, 137.05, 138.01, 216.02, 316.07, and 317.00.

(110) According to Dr. Warner, of the 14 census tracts, 216.02 is located in Denton County, 316.07 and 317.00 are located in Collin County and the remaining eleven census tracts, 136.01, 136.04, 136.05, 136.06, 136.07, 136.08, 136.09, 137.04, 137.05, 138.01, are located in Dallas County.

(111) In Dr. Warner's opinion, approximately 30% of PHN's patients would come from outside the service area and 70% from within the service area.

(12) In Mr. Ashworth's opinion, the medical service area of PHN would not contain other health care facilities to serve Dr. Warner's estimated 1986 population of 167,728.

(113) In Dr. Warner's opinion, hospitals primarily serving the North Dallas, South Collin, and Denton County area would have an estimated 868.9 additional beds filled at 80% due to population growth and aging by 1986.

(114) In Dr. Warner's opinion, after each of these hospitals serving the North Dallas, South Collin, and Denton counties become occupied at 80% in 1986, there would be 384 additional beds in 1986 which could be filled at 80% occupancy due to trends alone.

(115) In Dr. Warner's opinion, by his projecting modest market retention rates for the PHN facility the figures show it to be above 80% utilization by 1986.

(116) Dr. Warner assumed that PHN would have a 5% market share in 7 of the census tracts in 1986.

(117) Dr. Warner assumed that PHN would have a 10% share in one census tract in 1986.

(118) Dr. Warner assumed that PHN would have a 15% share in five census tractsin [sic] 1986.

(119) In the census tract in which PHN would be located, Dr. Warner assumed a 25% retention rate.

(120) According to Dr. Warner, retention rates experienced at neighboring or comparable facilities showed a pattern that is generally higher than the projected retention rates of PHN.

(121) According to Dr. Warner's reading of the four-week TDH–THA patient origin study, Plano General retained 57% of the admissions for zip code 75075, 54% from 75023, 46.1% from 75074, 8.9% of the admissions from 75080, 7.8% of the admissions from 75007, 7.4% of the admissions from 75028, and 6.2% of the admissions from 75248.

(122) According to Dr. Warner's reading of the same source, Richardson retained 22.2% of all admissions from 75080, 15.3% from 75081, 11.5% of the admissions from 75248, 6.3% from 75075, 5.3% from 75074, 4.8% from 75023, and 4.7% from 75007.

(123) According to Dr. Warner's reading of the same source, the TDH–THA patient origin study shows that Lewisville retained 54.4% of all admissions from 75067, 34.4% from 75056, 29.6% from 75028, 4.7% from 75007, and 4.3% from 75006.

(124) According to Dr. Warner's reading of the same source, Brookhaven retained 25.3% from 75006, 23.3% from 75234, 12.5% from 75007, 11.1% from 75028, 10.9% from 75229, 6.5% from 75220, 6.1% from 75056, and 6.1% from 75240.

(125) In Dr. Warner's opinion, adding nearly 100,000 persons to the three census tracts located in Denton and Collin Counties by 1986 would lead to serious problems of accessibility and lack of hospital capacity, especially since trends alone would fill all area hospitals at 80% and there would still be 384 additional beds that could be filled by trends alone at these facilities.

(126) According to Mr. Ashworth, PHN would be located in a service area which is in an area of unprecedented population growth.

(127) According to Mr. Ashworth, the PHN site would be located off the Dallas Parkway, just north of Frankford Road, just south of FM 544 with access from the north and the south by Coit Road, Preston Road, and with access from the east and the west through Campbell, Arapaho, Spring Valley, LBJ Freeway, and Interstate 121.

(128) According to Mr. Luby, the road that provides current access to the site, Dallas Parkway, would be the Dallas North Tollway Extension which would front the site.

(129) According to Mr. Luby, the site is currently accessible and the accessibility would be greatly improved by the planned improvements.

(130) According to Mr. Ashworth, PHN would become a component of the Presbyterian network of health care facilities and this relationship between PHN and PHD would assure continuous quality care.

(131) In Mr. Ashworth's opinion, the integration of various levels of care between PHN and PHD insures a cost effective mode of making quality medical services available and accessible.

(132) In Mr. Ashworth's opinion, PHN would provide a comprehensive spectrum of services.

(133) In Mr. Ashworth's opinion, coordination agreements for shared services would be executed between PHN and Presbyterian

3. The remainder of the agency's "findings of fact," numbered 136 through 147, essentially summarize the testimony in *opposition* to appellants' application and their position relative to the need for their proposed project.[9]

‘ When one examines the "findings of fact" pertaining to the finding of ultimate fact now under review, one discovers that almost every one of them is prefaced by the phrase "in the opinion of" a named witness or the phrase "according to" a named witness. These "findings," for the reasons we have stated, can provide no "support" for the finding of ultimate fact that appellants' proposed facility is not "necessary to meet the health care requirements of the medical service area." *Thompson, supra; Morgan Drive Away, supra.* The only findings of fact *not* so prefaced are "findings of fact"

numbered 138 through 140. Numbers 138 and 139 recite expected hospital-bed occupancy rates for certain areas "as defined by Mr. Short." From this phrase, we cannot determine whether or not the Commission believed that the areas "defined by Mr. Short" were areas relevant and probative in the contested case before the agency; and these "findings" suffer from the same defect as the "findings" already discussed, although the defect is manifested in another form. "Finding" number 140 states a projected occupancy rate for licensed acute care beds in a certain area; however, this fact alone obviously does not address the whole issue made by the applicable criterion and does not, standing alone, provide a reasonable basis for the Commission's finding of ultimate fact. None of the "findings of fact" purport to declare as true any identifiable specific and contested fact logically

Medical Center and Presbyterian Hospital of Dallas.

(134) The area Mr. Ashworth defined as PHN's primary service area is generally North Dallas County, Southeast Denton, and Southwest Collin County which includes portions of the cities of Dallas, Plano, Addison, Carrollton, Farmers Branch, and Hebron.

(135) Dr. Warner did not prepare the service area Mr. Ashworth defined nor did he select census tracts which have been identified in the application as the proposed medical service area for the application.

9. The findings are as follows:

(136) In the opinion of Mr. Short, based on a comparison of the defined service area of PHN, there would be a surplus of 15 to 30 beds in the service area through 1986.

(137) According to Mr. Short, located along the periphery of the defined geographic service area of PHN is Lewisville Memorial Hospital with 110 licensed beds, Carrollton Community Hospital with 75 licensed beds, Brookhaven Medical Center with 264 licensed beds, Plano General Hospital with 193 licensed beds, and Richardson Medical Center with 116 licensed beds; for a total of 758 licensed hospital beds of the primary care type.

(138) If all Applicants were granted their licensed bed increases as proposed before the Commission, in the North Dallas area the forecast occupancy rate in 1984 for the northwest area as defined by Mr. Short would be 51.1%.

(139) If all Applicants were granted their proposed licensed hospital bed increases as presented before the Commission at this

time, the forecast occupancy rate in 1984 for acute care beds in the north central area of Dallas, Texas, as defined by Mr. Short would be 66.1%.

(140) If all Applicants were granted their requests for licensed acute care beds in the Northwest sector of Dallas and South portions of Collin and Denton counties, the forecast occupancy for 1984 would be 51.2%.

(141) In Mr. Purifoy's opinion, the target occupancy level for general acute care facilities to perform in an optimally efficient manner would be between 80 and 85%.

(142) In Mr. Purifoy's opinion, the addition of two licensed hospital beds in an area currently served by Lewisville Memorial Hospital would have an adverse impact on Lewisville.

(143) According to Dr. Vinson, there are currently 47 hospitals in the Dallas area which are reported to provide general, acute-care services.

(144) According to Mr. Harris, as of December 31, 1980, Plano General Hospital, with 193 licensed beds, had an occupancy of 52.2%.

(145) In Mr. Harris' opinion, Plano General for the last three years has demonstrated growing numbers of admissions from the area Mr. Ashworth defined as the geographic service area of PHN.

(146) According to Mr. Purifoy, a recent occupancy rate of Lewisville based on 110 licensed and set-up beds was 54%.

(147) In Mr. Purifoy's opinion, Lewisville, has the capacity to provide an additional 18,-615 in-patient days of care per annum based on current occupancies.

related to the abstract legal standard or criterion contained in the statute and the Commission's rule.

And if one were to assume that the Commission adopted all of the testimony summarized in the agency's final order, which is prefaced by the phrases "in the opinion of" and "according to," the findings of basic fact contained in the order still do not state a reasonable basis for the Commission's conclusion or finding of ultimate fact. The substance of the testimony recited in "findings of fact" 136 through 147 appears to be that the medical service area, designated by someone for Presbyterian Hospital North, would have a surplus of beds through 1986; that there are several hospitals on the periphery of this designated medical service area; that if all applications for certificates of need were granted, the occupancy rates for certain designated areas would be considerably lower than "the target occupancy level for general acute care facilities to perform in an optimally efficient manner"; and that two hospitals in the vicinity of the proposed Presbyterian Hospital North have occupancy rates considerably lower than this "target occupancy level." And if we disregard the fact that findings numbered 92 through 135 are mere summaries of the testimony as well, they show that the hospital proposed by appellants would be built on donated land; that it would provide comprehensive, high-quality, low-cost health care services by virtue of its affiliation with the Presbyterian "network"; and that existing hospitals and the proposed Presbyterian Hospital North would be operating at or above the optimally efficient occupancy rate in 1986 as a result of growth in the area population.

The "findings" that certain areas would temporarily incur low occupancy rates *if all applications were granted* do not contradict

a need for Presbyterian Hospital North. The occupancy rates would understandably be higher if only *some but not all* applications were approved, but there is nothing in these findings to indicate why Presbyterian Hospital North should not be among the approved projects, particularly in light of the companion "findings" that it would provide low-cost and high-quality care.

The findings of basic fact therefore do not reasonably lead to the conclusion that Presbyterian Hospital North is not necessary to meet the health care requirements of the medical service area. The finding of ultimate fact, or conclusion of law, relative to the first criterion applied by the Commission is therefore arbitrary and capricious and in violation of APTRA § 19(e)(6) because it is not accompanied by a sufficient statement of underlying facts as required by APTRA § 16(b). *Charter Medical, supra.*

## SERVICE AREA POPULATION

██ The criterion applied by the Commission was also derived from § 3.10(b) of the Texas Health Planning and Development Act and the agency's former rule 315.-19.01.030, which requires that "[t]he medical service area for the project must contain sufficient current and future population to require the additional facility or service."

The Commission found that the "proposed project does not contain sufficient current and future population to require the project because of the following Findings of Fact." The agency's final order then sets out twenty-five "findings of fact" which purportedly support this finding of ultimate fact or conclusion of law. The first nineteen of them summarize testimony showing a need for the project proposed by appellants; they are quoted below.[10] This

---

**10.** The "findings" are as follows:

(1) In Mr. Ashworth's opinion, the PHN service area he has defined would be in an area of North Dallas County and South Collin and Denton Counties which is undergoing unprecedented population growth.

(2) In Dr. Warner's opinion, the 14 census tracts included within the PHN defined ser-

vice area had an estimated 1977 population of 50,098.

(3) Dr. Warner projects the defined PHN service area to more than triple in population by 1986 with 167,728 people.

(4) In Dr. Warner's opinion, census tract 317.00 in which PHN would be situated would grow from an estimated 1977 popula-

testimony estimates the population and projected population of an area designated as the medical service area of Presbyterian Hospital North, and various census tracts within that area, for the years 1977 and 1986, as well as the mortality rates estimated for various diseases in the Texas Health System Agency Area 5. "Findings of fact" twenty through twenty-five summarize the testimony adverse to appellant's applica-

tion of 654 to an estimated 1986 population of 10,469.

(5) Dr. Warner estimated that census tract 316.07, lying directly north of the census tract on which PHN would be located, would grow from 406 to 50,959 from 1977 to 1986.

(6) Dr. Warner estimates that census tract 216.02 lying due west of the census tract in which PHN would be located would increase its population from 7,244 to 46,409 by 1986.

(7) Dr. Warner estimates that census tracts 136.01 and 136.04, lying directly south of the proposed site, would increase from 1977 populations of 6,640 and 4,267 to 1986 populations of 14,380 and 7,974, respectively.

(8) Dr. Warner estimates that census tracts 136.05 and 136.06, lying further south of the site, would grow from 5,889 to 5,979 and from 3,474 to 4,278, respectively from 1977 to 1986.

(9) Dr. Warner estimates that the other census tracts (136.07, 136.08, 136.09, 136.10, 137.04, 137.05, and 138.01) in the aggregate would grow from 21,524 in 1977 to 26,780 in 1986.

(10) In Dr. Warner's opinion, his taking 6/13 of the project 1977–90 growth as an estimate of the growth in the population of each zip code between 1980 and 1986 is reasonably conservative.

(11) In Dr. Warner's opinion, there is no reason to assume that in-migration to the area from outside the SMSA or that the natural population increase would increase at a compound rate.

(12) In Dr. Warner's opinion, the population of Dallas County as a whole will be aging through the decade of the eighties.

(13) In Dr. Warner's opinion, hospital utilization rates rise more than seven-fold between the 13–34 years age group and 75+ years age group.

(14) According to Dr. Warner, NCTCOG projections for population growth for Dallas, Denton, and Collin counties between 1980 and 1990 were:

(a) Dallas County: 1,596,850 to 1,774,257 (+11.1%);

(b) Denton County: 150,650 to 226,789 (+50.5%); and

(c) Collin County: 144,150 to 268,050 (+89.9%).

tion; these are also quoted below.[11] An examination of the twenty-five "findings of fact" reveals the same defects found in those "findings of fact" which relate to community health care requirements and which have been discussed above: they are either prefaced by the phrase "according to" a named witness or they relate to "the area Mr. Ashworth defines as a [particular]

(15) According to Mr. Ashworth, the infant mortality rate in TA5HSA was 16.5 deaths per 1,000 live births in 1977.

(16) According to Mr. Ashworth the neonatal mortality rate in TA5HSA was 12.1 deaths per 1,000 live births in 1977.

(17) According to Mr. Ashworth, cancer mortality rates per 100,000 population for 1976–77 for TA5HSA were: cancer of the respiratory system, 39.3; cancer of the digestive organs and peritoneum, 35.3; breast cancer in women, 12.6; cancer of the genital organs, 15.7.

(18) According to Mr. Ashworth, the TA5HSA 1980 HSP states the premature mortality rate for ischemic heart disease should reach 53.0 deaths per 100,000 population in urban areas and 61.0 deaths per 100,000 population in non-urban areas.

(19) According to Mr. Hawthorne, HPN would have the same indigent care policy as Presbyterian Hospital of Dallas.

11. The "findings" are as follows:

(20) According to Mr. Luby, the current Dallas Parkway is basically a two lane rural highway.

(21) According to Mr. Short, located along the periphery of the defined geographic service area of PHN is Lewisville Memorial Hospital with 110 licensed beds, Carrollton Community Hospital with 75 licensed beds, Brookhaven Memorial Center with 264 licensed beds, Plano General Hospital with 193 licensed beds, and Richardson Medical Center with 116 licensed beds; for a total of 758 licensed hospital beds of the primary care type.

(22) Medical City Dallas Hospital currently serves the area Mr. Ashworth defines as PHD's medical service area.

(23) If approved, Medical City would add 116 medical/surgical beds to the bed complement serving this area.

(24) Brookhaven Medical Center and Richardson Medical Center currently serve the area Mr. Ashworth defines as PHN's medical service area.

(25) If Brookhaven and Richardson further evidence economic feasibility and if both are approved, 127 medical/surgical beds, beyond Medical City's 116, would be added to the bed complement serving this area.

medical service area." For these reasons alone, the "findings of fact" do not support the Commission's findings of ultimate fact or its conclusion of law, to the effect that the "proposed project does not contain sufficient current and future population to require the project . . . ." Again, the "findings" relating to the 243 beds to be added are not probative because no findings indicate that these proposed projects should be approved in preference to Presbyterian Hospital North. The Commission's finding of ultimate fact or conclusion of law is therefore not reasonably supported by findings of underlying fact and is arbitrary and capricious. APTRA §§ 16(b), 19(e)(6). *Charter Medical, supra.*

### LESS COSTLY, MORE EFFECTIVE AND MORE APPROPRIATE ALTERNATIVES

█ The criterion applied by the Commission was derived from the agency's former Rule 315.19.01.050 which provided in part as follows:

.050. Less Costly, More Effective, and More Appropriate Alternative. The project's [sic] approach to providing health care services should be less costly, or more effective or more appropriate than other methods which are available, or which have been approved to be developed. The project should integrate with the existing health care services and facilities in the medical service area. The applicant shall address the following: [there follows a list of factual proposi-

tions pertaining to the projects covered by the two sentences preceding.]

The Commission found that the project proposed by appellants "is not less costly, more effective, nor more appropriate than other facilities or services which are available or which have been approved to be developed because of the following findings of fact." The agency's final order then lists the six "findings of fact" quoted below.[12] The first three summarize testimony *favorable* to appellants' application; the last three conclude that building the project proposed by appellants is not "less costly, more effective, and more appropriate" because the project is simply *not needed at all* based upon the "findings of fact" we have discussed previously in this opinion under the "community health care requirements" criterion first applied by the agency. The Commission necessarily based its finding of ultimate fact or conclusion of law, relative to the criterion expressed in Rule 315.19.01.-050, upon its last three findings of basic fact for the first three would favor the granting of appellants' application.

It is obvious that this finding of ultimate fact or conclusion of law cannot be sustained. The criterion which it purports to apply is by its terms independent of the criterion dealing with "community health care requirements"; and because we have determined that the Commission's finding of ultimate fact or conclusion of law relating to "community health care requirements" is invalid, the asserted basis for the Commission's finding of ultimate fact or conclusion of law relative to "less costly,

---

**12.** (1) According to Mr. Ashworth, as an institutional function, alternatives were examined and the alternative action of doing nothing (that is, not providing health services to a rapidly growing area) was determined not to be a feasible approach.

(2) According to Mr. Ashworth, the chosen alternative was a satellite hospital connected in a multi-institutional arrangement with Presbyterian Medical Center (PMC) and Presbyterian Hospital of Dallas (PHD); a satellite facility with shared services agreements with PHD that would be able to provide a complete continuum of care.

(3) According to Mr. Ashworth, a third alternative was the expansion of a facility which

would not assure the shared services agreements of PHD to provide a complete continuum of care.

(4) The proposed project is not necessary to meet the health care requirements of the Community or population to be served because of those Findings of Fact set out above under Community Health Care Requirements.

(5) Since the project is not necessary, not building the project is less costly, more effective and more appropriate than building the project.

(6) The proposed project is more costly, less effective and less appropriate than not building the project.

more effective and more appropriate alternatives" must be held invalid as well, for it purports to rest upon no other basis than the Commission's former determination.

Because we hold invalid all the findings of ultimate fact upon which the Commission based its final order, that order cannot stand. Accordingly, we reverse the judgment of the district court and remand the cause to that court with instructions that it be remanded to the Commission for further proceedings not inconsistent with this opinion.