GUY A. THOMPSON, TRUSTEE, ET AL V. HOVEY PETROLEUM COMPANY ET AL.

No. A-2829. Decided February 7, 1951.
(236 S. W., 2d Series, 491.)

*Kelley, Mosheim ,& Ryan, Baker, Botts, Andrews & Parrish,* all of Houston, *Wigley, McLeod, Mills & Shirley,* all of Galveston, *J. T. Suggs* and *Stroud & Dyer,* all of Dallas, *Allen, Gam-*

*bill & Gambill* and *Seth Barwise,* all of Fort Worth,, *Kenneth, McCalla, Walter Caven* and *Austin L. Hatchell,* all of Austin, for Guy A. Thompson, Trustee, and other railroad petitioners.

The Court of Civil Appeals erred in holding that the orders of the Railroad Commission complied, or substantially complied, with the statutes and that such orders were supported by substantial evidence. State of North Carolina v. United States, 325 U. S. 507, 65 Supt. Ct., 1260; Bell Telephone Co. v. Driscoll, 343 Pa. 109, 21 Atl. 2d 912; Southland Life Ins. Co. v. Greenwade, 138 Texas 450, 159 S. W. 2d 854.

*Kelley, Looney, McLean & Littleton, Rogers Kelley* and *Jackson Littleton,* all of Edinburg, for intervenors.

Submitted practically the same points of error as those submitted by petitioners and cited Security State Bank v. State, 169 S. W. 2d 554; Railroad Com. v. Shell Oil Co., 139 Texas 66, 161 S. W. 2d 1022; Gulf Land Co. v. Atlantic Refining Co.. 134 Texas 59, 131 S. W. 2d 73.

*Albert G. Walker,* of Austin, for Hovey Petroleum Co. and others, *Ewell H. Muse, Jr.,* of Austin, for Corbett and Younger Bros.; *W. D. Benson, Jr.,* of Lubbock, for Oil Transports, *Rankin, Kilgore & Cherry,* of Edinburg, for A. & M. Transport Co., *Price Daniel,* Attorney General, and *Durward M. Goolsby,* Assistant Attorney General, for Railroad Commissioners, respondents.

In support of the contention that the Court of Civil Appeals committed no error in its judgment and that said judgment was correct respondents cite Railroad Commission v. Metro Bus Lines, 144 Texas 420, 191 S. W. 2d 10; Texas & Pac. Motor Transp. Co. v. Railroad Commission, 124 Texas 126, 73 S. W. 2d 509; Jones v. Marsh, 148 Texas 362, 224 S. W. 2d 198.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

Prior to May 5, 1949, Respondents Hovey Petroleum Co. (dba Hovey Transport Co.), Cactus Transportation Co., Union Transportation, Inc., Younger Brothers, Oil Transports, Inc., Texas Consolidated Transportation Co., R. A. Corbett, A. E. York, J. F. Whitehurst (dba Coastal Transportation Co.), and A. and A. Transport Co. were duly authorized motor carriers, operating under specialized motor carrier certificates issued by the Railroad Commission of Texas. In December, 1948, and January, 1949, each of them filed with the Railroad Commission

an application to amend its certificate so as to authorize it to transport designated chemicals "in bulk in tank trucks, in liquid form, to, from and between all points in Texas."

These applications were protested by Edgar M. Linkenhoger (dba Transport Co. of Texas), Robert P. York (dba York Transport Co.), York Transport Company, Inc., Commercial Oil Transport, Inc., and Robertson Transport Co., Inc., motor carriers, (three of whom had special permits to transport all, while the other two had such permits to transport part, of the products sought to be transported by respondents), as well as by 13 railroads operating in Texas.

On March 17, 1949, hearing on these applications was begun before an examiner for the Railroad Commission, all applications being heard together over the objection of protestants. Evidence was introduced both by applicants and by protestants.

Upon report of its examiner, the Railroad Commission on May 5, 1949, entered its order granting the amended certificates.

The protesting railroads filed suit in the District Court of Travis County against all the applicant motor carriers, Hovey Petroleum Co. et al, and the Railroad Commission, seeking to have the Commission's order declared void and to enjoin the applicant motor carrier from operating thereunder. The five protesting motor carriers intervened as plaintiffs, seeking the same relief as that prayed by the railroads.

The trial court entered judgment for the defendants ,which was affirmed by the Court of Civil Appeals. 232 S. W. 2d, 146.

The railroad plaintiffs filed application for writ of error, as did the motor carrier intervenors, and both applications were granted; but we have concluded that our disposition of the cause turns on Point of Error No. 1, of the motor carriers' application, which is:

"The Court of Civil Appeals erred in holding that there was 'substantial compliance' with the clear and mandatory requirements of Section 5a(d), Article 911b, which provides that the Commission's orders *shall be void* unless they include 'full and complete findings of fact pointing out in detail' the inadequacies of existing carriers, the orders not having included any findings at all (much less the kind required) as to these Motor Carriers * *."

Art. 911b, sec. 5a(d), Vern. Anno. Civ. Stat., referred to in the above points, provides:

"Before any such application (for a permit to operate as a specialized motor carrier) shall be granted, the Commission shall hear, consider and determine said application in accordance with Sections 8, 9, 11, 12, 13, 13a, 14 and 15 of Chapter 277, Acts of the Forty-first Legislature, Regular Session, as amended (Article 911b, Revised Civil Statutes of Texas, 1925, as amended), and if the Commission shall find any such applicant entitled thereto, it shall issue certificate hereunder on such terms and conditions as is justified by the facts: otherwise said application shall be denied. *The Commission shall have no authority to grant any application for a certificate* of convenience and necessity *authorizing operation as a 'Specialized Motor Carrier'* or any other common carrier *unless it is established by substantial evidence* (1) *that the services and facilities of the existing carriers serving the territory or any part thereof are inadequate;* (2) that there exists a public necessity for such service, and (3) the public convenience will be promoted by granting said application. *The order of the Commission granting said application and the certificate issued thereunder shall be void unless the Commission shall set forth in its order full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers,* and the public need for the proposed service. * *" (Italics ours.)

The language of the Commission's order which purports to set forth "full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers" is as follows:

"THE COMMISSION FURTHER FINDS from the evidence that applicant presented witnesses who testified as to the need for the proposed service, said witnesses being representatives of variout chemical industries located in various parts of the State of Texas and engaged in the manufacture, sale, distribution and handling of the chemicals hereinabove set out, some of said companies so represented being engaged in so handling some of the chemicals above named, while others thereof are engaged in so handling others of said chemicals, but that the evidence of each and all of said witnesses was along the same general line as to the need for the proposed service, which in addition to other matters, was as follows: that they had been handling said chemicals in tank cars, it having been necessary that many of said chemicals be transported in tank cars that were lined with various materials in order that same could be safely handled

and transported; that the tanks or tank trucks used in transporting said chemicals, or some of them, have to be lined with various materials in order that said chemicals can be safely transported; that some of the tank trucks used in the transportation of said chemicals will have to be lined while others will have to be constructed of stainless steel or aluminum, and that some of said chemicals can be transported in iron tanks; that there has been delay in the transportation of said chemicals by using tank cars, in that the supply of such cars were short at times and they were unable to secure same as and when needed, but that tank cars had been more easily secured of late; that various customers of said companies over the State did not have very much storage and had to purchase said chemicals in small quantities in order to have a place to store same; that this made it necessary to ship same to said customers in small drums; that the use of drums made it much more expensive to supply the needs of said customers; that many of their customers were not located on rail lines and could not, therefore, secure the delivery of chemicals by the use of tank cars; that, if the proposed service is authorized, chemicals can be delivered to such customers by tank trucks, and it will also be possible to build up an additional market for said products and make it much more economical for said customers as they would not then have to pay the extra charge for the drums used in shipping same; that the proposed service is needed as a supplement to the tank car service now available; that at times tank cars were hard to get and inconvenience was suffered as a result thereof; that they had experienced inconvenience in securing the smaller size railroad tank cars; that, if the drums heretofore used could be done away with, the customers could get a better price on the chemicals they purchase; that, by the use of a tank truck service, a market could be developed off rail lines which are presently reached by using drums and shipping in small lots; that, the proposed service would aid materially in getting new customers; that it would also make it possible for customers to get along with smaller storage space, which would be an advantage to them; that at times railroad tank cars break down and that it takes some time to get a car rolling after it breaks down; that they had had some experience in the movement with tank trucks and that it was a great convenience to the companies and to the customers; that some of said chemicals are explosive, inflammable and dangerous; that it is an advantage to have tank trucks to use instead of tank cars; that they need the proposed service in their business; that they would like to have the service of more than one carrier; that the movement of some of said chemicals is to oil fields that are not served by railroads, and

that the railroads could not handle such movements; that it would be convenient to have tank truck service available for them and their customers; that it would also be economical to have such service; that, if they had such service, they would not have to have extra trackage; that such service would be and advantage to a customer who is not presently receiving liquid chemicals in tank trucks, in that it would enable him to have a smaller storage; that the time element is very important in the chemical business; that there is a need for the type of service proposed; that, if said service is made available, they will use it; that such service would be a convenience to them and would be used if it is made available; that such service would enable them to have customers off the rail lines, also such customers that are small and don't have the money to buy a full tank car of these materials can be served by tank trucks; that it will enable some of the small operators with small storage that could not buy a car load to be supplied with chemicals; that the speed with which said chemicals are delivered to the customers is a material consideration; that delay had been experienced in the use of railroad tank cars when there was a break down on the road; that such delay was a great inconvenience; that the proposed service would be beneficial; that, if the proposed type of service were available, their customers could be better served; that the expense of shipping by drums is greater than by bulk; that in point of time tank car service is not equal to the service rendered by the tank trucks; that at times they are not able to get a quick shipment by rail because of the lack of cars and because of the congestion around some of the rail points; that the storage of some of said chemicals is costly and delay in getting shipments causes additional expense in building storage; that the tank truck service is necessary in order to furnish chemicals to small locations and the proposed service would be convenient; that some chemicals are distributed to the oil fields or oil well sites; that the tank car service has been inadequate, that it is easier to unload from tank trucks than from tank cars; that the least amount that can be shipped by railroad tank cars is a full tank car load; that some of the customers do not have trackage, and some need quicker service than tank car movement; that the proposed service would meet a need because of the limited storage facilities of some of the customers; that delays had been experienced in the use of tank cars and that equipment of that type is some times short and unavailable; that, by the use of tank trucks, new markets could be opened up which cannot be served by tank car service.

\*    \*    \*    \*

THE COMMISSION FURTHER FINDS that said application was protested by the rail lines operating in Texas, Edgar M. Linkenhoger, dba Transport Company of Texas, Robert P. York, dba York Transport Company, Robertson Transport Company, Ray Smith Transport Company, and Commercial Oil Transport, Inc.; that said rail lines offered evidence which was in part, as follows: that tank cars are built for any and all types of service and that the transportation of the chemicals described herein requires different kinds of tank cars; that there had been furnished to the companies represented by some of the witnesses who testified herein, tank cars for use in the transportation of the chemicals handled by said companies, and that no complaints had been received as to the shortage of tank cars; that all requests for tank cars had been filled; that tank cars can be furnished applicant herein upon reasonable notice of the need thereof; that the diversion of the chemicals named herein from railroad tank cars would have an injurious effect upon the company that built said tank car; that it was not known how many tank cars are now in Texas, but that there is a surplus of said tank cars in Texas at this time; that it would take two days to bring a tank car to Houston from Dallas and nine or ten days to bring one from Chicago to Houston; but that they usually have them in Houston; that some of the chemicals named above are inflammable, some are poisonous, some are explosive, and some are dangerous; that serious accidents occur in handling of some chemicals; that said chemicals have heretofore been transported to a large extent by the railroads of Texas. Proof was made as to the various parts of Texas through which different protesting rail lines operate, and that said rail lines interchange traffic with other rail lines so that they render service to all points in Texas having railroad connections; that the condition as to availability of tank cars had improved in the last ninety days; that there are tank cars standing idle on certain lines and some of them had been idle for more than ninety days. Exhibits were offered by several of said rail lines showing the number of pounds of certain chemicals transported by them in Texas during a certain period of time and the revenues derived therefrom; that said rail lines received a large revenue for the transportation of chemicals in Texas; that the transportation of chemicals is attractive traffic, and that the diversion of the transportation of the tonnage now being transported by said companies would seriously effect the service now being rendered by them; that such traffic is very material to the rail lines; that the rail lines have quite an investment in the terminals located at different points on their lines, and that some of said terminals would have to be abandoned if they lose the chemical traffic;

that the revenue received from the transportation of chemicals is a substantial part of the total revenue received by some of said rail lines; that if they lose the chemical transportation they might have to operate a less number of trains and curtail their service to the public; that they had not had any complaints of the service that they had been rendering in the transportation of chemicals."

At the trial in district court, petitioners offered testimony given at the hearing before the Commission's examiner by Robert P. York, Edgar M. Linkenhoger, J. R. Boswell and J. E. Robertson, witnesses for the protesting motor carriers.

York testified as to the facilities of York Transport Company of Texas and York Transport Co., Inc., who had got a specialized motor carrier permit in 1942 to transport petroleum and petroleum products, which permit had been amended by temporary order on February 1, 1949, and by permanent order on Feb. 16, 1949, to authorize them to transport chemicals, acids, molasses, milks, animal fats and vegetable oils in tank trucks. He testified that his concerns operated on a statewide basis and maintained and stationed equipment wherever needed in Texas; that he had made thorough solicitation and investigation to obtain "this new business", particularly shippers of chemicals and animal fats, but found them not interested in shipping by truck either because they lacked facilities to load and unload transport equipment or because they had no business; that 52 per cent of his equipment was not then being operated to capacity and so was available for use in the event of need; that he had order two specially equipped tank trucks on January 25, early delivery of which was promised and expected; that his concerns were in position financially to buy other specialized equipment as and when needed.

Linkenhoger testified that, under the name of Transport Co. of Texas, he had had a specialized motor carrier permit to transport petroleum products and other liquid commodities for about 15 years; that he received temporary authority on Jan. 25, 1949, which was made permanent on Feb. 1, 1949, to transport all the commodities which the applicants (respondents) were then seeking authority to haul; that he was then running at about 75 per cent capacity but was hauling 20 million pounds of petroleum products per month; that he maintained treminals at Corpus Christi, Brownsville, San Antonio, Hearne, Fort Worth, Wichita Falls, Amarillo, El Paso, Shreveport, Lake Charles and Austin, stationed equipment wherever needed in

Texas and operated in all sections of the state; that he then had about 35 pieces of standard equipment with which he could commence transporting "vegetable oils or cottonseed oil or caustic soda, or any of these things"; that when he received his amended certificate he immediately began soliciting the new business covered thereby, contacting particularly the larger chemical plants; that he had constructed four new pieces of equipment but had not found it necessary to rush because "there's been nothing to haul"; that he was then hauling about 8000 gallons of acetic acid per day to the DuPont plant in the Houston area.

Boswell testified that he operated the Commercial Oil Transport which had had authority from the Railroad Commission since 1942 to transport petroleum products, animal fats and vegetable oils to and from all points in Texas; that his concern then owned 22 complete units of operating equipment; that for several years he had been the only motor carrier in Texas transporting animal fats and vegetable oils as a common carrier; that he had found business in those commodities "fairly scarce" and then had 12 hauling units idle; that he then had eight truck tanks ready to go to hauling cottonseed oil, was in position to purchase any needed additional equipment and intended to do so.

Robertson testified that Robertson Transport Co. had had for about three years a contract carrier permit from the Railroad Commission to transport molasses anywhere in Texas for Southwestern Sugar and Molasses, the Surgartex Corporation of McAllen and Broadley & Parker; that it operated 49 tank trailers for molasses exclusively; that its equipment had not been used to capacity "in the past year", about 20 per cent of its equipment being idle.

With this testimony from existing motor carriers before the Commission, one looks in vain at the Commission's order, above quoted, for any disposition of it in "pointing out in detail the inadequacies of the services and facilities of the existing carriers", as required by Art. 911b, sec. 5a(d) supra. By reference to the second paragraph of the order quoted above it will be observed that the Commission says that the *"rail lines offered evidence which was in part as follows"*. (Italics ours) Following that is recounted testimony about *tank cars,* but there is not a single word about *tank trucks.* In the first paragraph of the order it is recited that if "the proposed service is authorized", tank trucks would reach inland points not reached by rail carriers, thereby making it possible to build up additional mar-

kets for the products in question; that use of tank trucks would make it unnecessary to use drums as some rail shipping requires, thereby eliminating the extra cost of the drums; that the use of tank trucks would enable customers to buy the products in smaller lots, thereby eliminating or reducing storage costs; that tank truck service would eliminate the cost of extra trackage necessary to the use of tank cars; that quicker service can be had from tank trucks than from tank cars. But there is no finding that these ends cannot be accomplished by use of tank trucks available from existing motor carriers, i.e., the servicies and facilities of the motor carriers who are petitioners here. Therefore, under the clear, mandatory provisions of Art. 911b, sec. 5a(d), supra, both the orders and respondents' certificates issued thereunder are void.

This conclusion makes it unnecessary to consider any other question presented and requires a reversal of the judgments below.

Accordingly, the judgments below are reversed and judgment is here rendered for petitioners.

Opinion delivered February 7, 1951.

No motion for rehearing filed.