**PROFESSIONAL MOBILE HOME TRANSPORT, Appellant,**

v.

**RAILROAD COMMISSION OF TEXAS, et al., Appellees.**

No. 3-86-045-CV.

Court of Appeals of Texas, Austin.

April 8, 1987.

Rehearing Denied Aug. 12, 1987.

Gary Pinnell, San Antonio, for appellant.

Jim Mattox, Atty. Gen., Doug Fraser, Asst. Atty. Gen., Austin, for appellees.

Before POWERS, GAMMAGE and ABOUSSIE, JJ.

POWERS, Justice.

Professional Mobile Home Transport, a partnership, sued the Texas Railroad Commission in a Travis County district court for judicial review of a final order issued by the Commission in a contested-case proceeding. The order grants John Rice a certificate of convenience and necessity, entitling him to transport mobile homes as a "specialized motor carrier" between all points in Hidalgo, Cameron, and Willacy Counties. The district court refused to reverse the Commission's order and this appeal ensued. We will reverse the judgment below and remand the case to the agency. Tex.Rev.Civ.Stat.Ann. art. 911b, §§ 5a(c)–(g) and 20 (1964 & Supp.1987) (Texas Motor Carrier Act); art. 6252–13a, §§ 19 and 20 (Supp.1987) (Texas Administrative Procedure and Texas Register Act, or "APTRA"). We shall hereafter refer to Professional Mobile Home Transport as "appellant" and to Rice as the "applicant."

## THE REGULATORY STATUTE AS IT PERTAINS TO "SPECIALIZED MOTOR CARRIERS"

■ The Motor Carrier Act, Tex.Rev.Civ. Stat.Ann. art. 911b (1964 & Supp.1987), delegates to the Commission regulatory authority over several categories of motor carriers transporting property for compensation or hire over State highways. The fundamental purpose of such regulation is to achieve three rather large legislative objectives: (1) making transportation services available to all segments of business and industry where the services are necessary; (2) protecting those services from the harm occasioned by unfair and destructive competition; and (3) developing a complete transportation system throughout the State. *Oil Field Haulers Ass'n v. Railroad Commission of Texas*, 381 S.W.2d 183, 194 (Tex.1964). The statute is inordinately complex and poorly written. We must therefore devote a large part of this opinion to sorting it out in order that we may ascertain the meaning of its various provisions as they apply and govern the present appeal.

One category of carrier made subject to the Commission's regulatory powers is denominated "specialized motor carrier," a term defined in art. 911b, § 1(i) by reference to such carriers' operating characteristics, equipment, permissible cargoes, and other particulars. With regard to such carriers, one aspect of the Commission's regulation is its power to license their operation through issuing "certificates of convenience and necessity" on application by those wishing to operate as a specialized motor carrier.[1] Sections 5a(d) through 5a(g) of the statute pertain especially to specialized motor carriers and directly im-

---

1. The use of the certificate of convenience and necessity in regulating transportation over the highways of Texas was first employed in the Motor Bus Act of 1927, Tex.Rev.Civ.Stat.Ann. art. 911a (1964). From that predecessor statute, the certificate requirement was incorporated into the Motor Truck Law of 1929 and successor statutes. Bailey, *Motor Truck Certificates and Permits*, 20 Tex.L.Rev. 165, 167–68 (1941).

The expression "convenience and necessity" is simply a conclusory symbol. It declares the Commission's final decision on whether the public benefit derived from the proposed motor-carrier service justifies granting the authority requested by the applicant. The Commission's determination on that question constitutes the agency's judgment on the facts and law of the case in reference to several matters. First, of course, it is a judgment concerning the several

pose certain requirements relative to their licensing by the Commission. In addition, § 5a(d) requires that the licensing of specialized motor carriers be conducted "in accordance with" the requirements found in art. 911b, §§ 4(e), 8, 9, 11, 12, 13, 13a, 14 and 15—requirements that evidently pertain to most, if not all, licensing proceedings conducted by the Commission. In any case, they are expressly made applicable to the licensing of specialized motor carriers and we shall treat them accordingly in the discussion that follows.

*The Commission's Authority.* In § 5a(a), the Commission is authorized to issue certificates of convenience and necessity to persons wishing to engage in the business of a specialized motor carrier, on application and hearing and under the terms and conditions provided in art. 911b.

*Requisites of the Application.* The application is required by § 5a(c) to be in writing, and it must "set forth in detail" certain specified information, namely:

1. the name and address of the applicant and its officers, if any, the "applicant" being the "real party at interest";

2. "full information concerning the financial condition and physical properties of the applicant";

3. the commodities or classes thereof that "the applicant proposes to transport";

4. "the specific territory or points to, or from, or between which the applicant desires to operate," the application being accompanied by a map showing such territory and points.

5. a "description of each vehicle which the applicant intends to use";

6. a statement pointing out "the public necessity for the proposed service";

7. a statement of "the particulars [wherein] the public convenience would be promoted by the institution of the proposed service"; and,

specific factors the Legislature has directed the agency to consider in the licensing process established in art. 911b for specialized motor carriers. These factors are discussed at some length in the text of this opinion. Next, the determination and appraisal of those factors may require and incorporate the agency's consideration and judgment about pertinent administrative policies and the agency's interpretation of its regulations and the statutory provisions it is required to administer. *See generally, Bailey, supra;* Jones, *Origins of the Certificate of Public Convenience and Necessity: Developments in the States, 1870–1920,* 79 Columbia L.Rev. 425 (1979); Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases,* 16 Texas Tech L.Rev. 475, 478 (1985).

Notwithstanding the employment of the two words "convenience" and "necessity," the symbol essentially represents the unitary idea referred to above—a decision on whether the resulting public benefit justifies granting the authority. It may be thought that the word "necessity" is surplusage—if a showing of "convenience" will be sufficient, why mention the more difficult showing implicit in the word "necessity"? This is not the case, however. As explained above the entire expression is a technical one not dependent upon common usage. In any case, however, the single idea inferrable from the two words is more akin to "necessity" as opposed to "convenience," for in construing the same expression as it is used in art. 911a, the Supreme Court has stated that "the applicants must show more than public convenience;

it [sic] must also establish public necessity...." *Railroad Commission of Texas v. Continental Bus Sys.,* 616 S.W.2d 179, 182 (Tex.1981). In *Miller v. Railroad Commission,* 363 S.W.2d 244 (Tex.1962), the same idea is expressed in reference to art. 911b when the court at page 246 refers to the ultimate finding of "a genuine public need for the proposed service" but omits entirely the concept of "convenience."

In the text of this opinion, it will be seen that we treat as *separate* inquiries the three norms and standards of (1) public convenience, (2) public necessity, and (3) inadequacy of existing facilities and services. This is, of course, directly contrary to the unitary idea behind the symbol implicit in a certificate of convenience and necessity. The three are essentially interdependent and appear to us to be treated as such by the Commission and the Supreme Court in many instances. Nevertheless, art. 911b unquestionably and literally dictates a separate and independent consideration of the three norms and standards. *See e.g.,* § 5a(d) and § 4(e), the latter being incorporated in the former section by reference to make it applicable to the licensing of specialized motor carriers. The statutory separation of the three ultimate facts—norms and standards really, as well as conclusions of law made upon an appraisal and judgment about all the subsidiary factors the statute directs the Commission to consider—is distinctly artificial, particularly in view of the fact that many of the subsidiary factors could relate logically to all three.

8. a statement specifying "wherein additional facilities or service are required and would be secured by the granting of the application."

Unless the application contains the information specified above, § 5a(c) provides that "[t]he Commission shall have no jurisdiction to consider" the application, set it for hearing, hear the evidence and argument of the parties, or determine whether to issue the certificate.

*The Ultimate Facts Requiring Determination.* Before issuing authority to operate as a specialized motor carrier, the Commission is required to determine several ultimate facts specified directly in § 5a(d) or in the other sections referred to therein. In § 5a(d), it is stated that the Commission "shall" issue the requested certificate "unless" the following are established in a contested-case proceeding:

[a] the services and facilities of the existing carriers serving the territory or any part thereof are adequate; or

[b] there does not exist a public necessity for such service; or

[c] the public convenience will not be promoted by granting said application.

The three norms and standards here set forth, (1) public convenience, (2) public necessity, and (3) adequacy of existing services and facilities, are echoed in art. 911b, § 8 which is expressly made applicable to the licensing of specialized motor carriers. Section 8 provides:

The Commission is hereby vested with power and authority, and it is *hereby made its duty* upon the filing of an application ... to ascertain and determine under such rules and regulations as it may promulgate, after considering existing transportation facilities, and the demand for, or need of additional service, if there exists a public necessity for such service, and if public convenience will be promoted by granting said application....

(emphasis added).

■ Section 9 of art. 911b is also applicable to the licensing of specialized motor carriers. Section 9 provides in part: .

The Commission *shall ascertain and determine if* a particular highway or highways designated in an application ... are of such type of construction or in such state of repair, or subject to such use as to permit of the use sought to be made by the applicant, without unreasonable interference with the use of such highways by the general public for highway purposes. And if the Commission shall determine, after hearing, that the service rendered by existing transportation facilities or agencies is reasonably adequate, or that public convenience would not be promoted by granting of said application, and the operation of motor vehicles on the public highways therein designated, or that such highway or highways are not in such state of repair, or are already subject to such use as would not permit of the use sought to be made by the applicant without unreasonable interference with the use of such highways by the general public for highway purposes then in either or any of such events said application may be denied and said certificate refused, otherwise the application shall be granted and the certificate issued upon such terms and conditions as said Commission may impose and subject to such rules and regulations as it has or may thereafter prescribe.

(emphasis added). This particular provision in art. 911b embodies a principal legal basis upon which the State purports to regulate motor carriers—because the State's highways are constructed and maintained at public expense and for ordinary purposes, and no one has a vested or inherent right to make a special or pecuniary use of them, the State may forbid such use except under official authority, granted on such grounds and conditions as the Legislature may direct in the public interest. *See Stephenson v. Binford,* 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288 (1932); *Ex parte Sepulveda,* 2 S.W.2d 415 (Tex.Cr.App. 1928). Section 9 establishes two propositions. First, it directs that "[t]he Commission shall ascertain and determine" whether the nature and condition of the high-

ways specified in a carrier's application will permit the intended use without unreasonably interfering with the general public's use. We interpret this to be a legislative requirement that the Commission *must* consider and decide the issues of conservation and safety implicit in the first sentence of § 9.[2] Second, § 9 provides that the Commission "may" deny an application "if the Commission shall determine, after hearing," any of the following:

- the service rendered by existing transportation facilities or agencies is reasonably adequate [or] public convenience would not be promoted by granting of said application, *and* the operation of motor vehicles on the public highways therein designated [;] or

- such highway or highways are not in such state of repair, or are already subject to such use as would not permit of the use sought to be made by the applicant without unreasonable interference with the use of such highways by the general public for highway purposes....

(emphasis added). Number [1] simply reiterates the public necessity and public convenience findings in terms of the highways proposed to be utilized by the applicant. Number [2], of course, establishes a ground for denying the application based upon the issue that the Commission is directed to decide in number [1]. Thus, the highway-conservation and safety inquiries directed by § 9 *may* be viewed as co-equal with the standards of public convenience and necessity. Certainly, however, they are incorporated in these broader standards.

Section 9 also directs that the Commission "give weight and due regard to" several other specified factors. The quoted expression indicates the undoubted legislative view that these other factors are criteria to be *considered* by the Commission in arriving at its ultimate findings relative to public convenience and necessity and adequacy of existing services and facilities. These other factors are:

(1) Probable permanence and the quality of service offered by the applicant.

(2) The financial ability and responsibility of the applicant and its organization and personnel.

(3) The character of vehicles and the character and location of depots or terminals proposed to be used.

2. There is little doubt about the imperative nature of the legislative command that "[t]he Commission shall ascertain and determine" the matters of highway conservation and safety in its licensing proceedings, as required by § 9 of the statute. It has been said, however, that the Commission need not make the determination based upon evidence in a particular case before it but rather upon what it has learned in earlier proceedings or upon its "general knowledge," gleaned from its day-to-day regulation of motor carriers. *See e.g., North East Texas M. Lines v. Texas & Pacific M.T. Co.,* 159 S.W.2d 926, 929 (Tex.Civ.App.1941, no writ). However, the enactment of APTRA, with its requirement in § 16(b) that agencies set forth in writing the underlying facts from which they infer findings "in statutory language," raises a serious question of whether the Commission may continue to determine highway conservation and safety based upon matters outside the record of the case before it.

Section 16(b) has been construed by the Supreme Court of Texas as requiring findings of basic or underlying fact supporting "all statutory fact findings that represent the criteria that the legislature has directed the agency to consider in performing its function." *Texas Health*

*Commission v. Charter Medical-Dallas, Inc.,* 665 S.W.2d 446, 451 (Tex.1984). In the present case, the "function" is one of licensing and the Legislature has done more than merely direct the Commission to "consider" the questions of highway conservation and safety—it has directed the agency to "ascertain and determine" such questions. If the Commission *must* make findings of underlying fact as to such matters, as *Charter Medical* requires in quite explicit terms, then two propositions necessarily follow: (1) to avoid absurdity, the Commission must also make findings of ultimate fact about highway safety and conservation, for a basic function of findings of basic or underlying fact is to demonstrate the reasonableness of the agency's findings of ultimate fact; and (2) if the Commission *must* make findings of basic or underlying fact, it may logically do so only upon evidence adduced in the case unless, perhaps, it follows the official notice provisions set out in APTRA § 14(g). As noted in the text of this opinion, these interesting issues do not arise in the present case because appellant has not raised them.

(4) The experience of the applicant in the transportation of property and the character of the bond or insurance proposed to be given to insure the protection of the public.

In other parts of art. 911b incorporated in § 5a(d) by reference, the Legislature has required the Commission to consider still other factors in proceedings looking to the issuance of a specialized motor carrier certificate. In § 8, quoted above, the Commission is directed to consider "existing transportation facilities, and the demand for, or need of additional service...." And § 13a, incorporated in § 5a(d) by reference, indicates that the matter of the applicant's equipment may be such a factor, for it places upon the Commission a "duty ... to approve or disapprove the nature and character of the equipment to be used under any ... certificate and the amount and character of tonnage which may be hauled thereunder...."

■ Owing to the provisions of § 4(e), discussed in the following paragraph, we conclude that the Legislature intended these various factors to be considerations leading to the Commission's determination of the three ultimate facts characterized as (1) public convenience, (2) public necessity, and (3) adequacy of existing services and facilities. Stated another way, the various factors were intended by the Legislature to be relevant to a determination of these three ultimate facts. Even so, any findings relative to these subsidiary factors must be supported by findings of basic or underlying fact, as we shall see subsequently. APTRA § 16(b).

*Burden of Proof in the Agency Proceeding.* In § 4(e), the Legislature has set forth a particular course of proceeding to be followed by the Commission in arriving at its determination of the three ultimate determinations required for the issuance of a specialized motor carrier certificate:

[a] In enforcing motor carrier entry requirements, the Commission shall require that the applicant and the protestant make the showings *otherwise required* *by law and the showings required by this subsection.*

[b] With respect to showing public convenience and necessity, the applicant is required to prove a prima facie case that the public convenience would be promoted and a prima facie case that a public necessity exists, and in these circumstances, the burden of proof to show that the public convenience would not be promoted or that a public necessity does not exist for the proposed service or that the existing carriers are rendering a reasonably adequate service shifts from the applicant to the opposing carrier or carriers.

[c] In determining the issues of public convenience and necessity, the Commission shall give no consideration to any protestant who does not show it possesses authority to handle, in whole or in part, the traffic for which authority is sought, it is willing and able to provide service that meets the reasonable needs of the shippers involved, and it has either performed service within the geographical scope of the application during the preceding 24-month period or has, actively and in good faith, solicited service within the geographical scope of the application during such period.

[d] Also, in determining the issues of public convenience and necessity, the Commission shall give no consideration to services and facilities of motor carriers not parties to the proceeding.

(emphasis added).

Provisions [a] and [b] are difficult to comprehend. For example, it is stated that the burden of proving that "existing carriers are rendering a reasonably adequate service *shifts* from the applicant to the opposing carrier" but neither [a] nor [b] explicitly puts this burden on the applicant in the first instance. On the other hand, § 8 would seem to require that the Commission must "consider" that matter in every case, even where an application is not opposed. In any case, consistent with our view of what the Legislature must have

intended by its recent enactment of § 4(e), we construe [a] and [b] as follows: To be entitled to a certificate in the absence of any showing by an opposing party, the applicant must adduce evidence sufficient in quality and kind, on all the factors required by law—at minimum those named and discussed previously—so as to enable the Commission reasonably to conclude (1) a public necessity exists for the proposed service and (2) the public convenience will be promoted by the Commission's authorizing the proposed service. This is, in our view, the meaning of the term "prima facie case." An opposing party may defeat *the prima facie case* by adducing contrary or impeaching evidence relative to the applicant's issues of public necessity or public convenience, so that it would be unreasonable for the Commission to conclude favorably to the applicant on either of those issues; or, the opposing party may defeat *the application* by adducing evidence sufficient in quality and kind so as to enable the Commission reasonably to conclude that existing carriers are rendering a reasonably adequate service. And, of course, the applicant may adduce contrary or impeaching evidence relative to this issue, so that it would be unreasonable for the Commission to conclude favorably to the opposing party on that issue.

■ Curiously, in § 5a(d), the Legislature has required that the three ultimate determinations be "established by the *substantial evidence* of record considered as a whole...." This is, of course, a patent contradiction in terms. An ultimate fact— "public necessity" for example—may never be "established" by "substantial evidence." The latter expression, as it is used in § 5a(d), evidently refers to the "substantial evidence" rule, a familiar aspect of administrative law. Specifically, it is a statutory or inherent *limitation* upon the power of *a reviewing court* in its consideration of an agency's finding of basic or underlying fact, and not a finding of ultimate fact such as "public necessity." The rule is designed to prevent a court from engaging in an

independent factual inquiry and determination based upon the evidence adduced in the agency; it thus prevents the court from substituting its own judgment for that of the agency as to what are the proper basic facts to be inferred from the evidence. The rule holds that when a given finding *reasonably could have been inferred* from the evidence adduced, then the agency's fact finding *is* supported by "substantial evidence" and may not be set aside on judicial review.

It is absurd, however, to suppose that the agency itself may "find" a fact from "substantial evidence." In the truth-finding process whereby an agency infers a basic fact from the evidence adduced in the case, it must infer the fact in the only way *any* fact finder may do so—by a preponderance of the evidence. Stated another way, a fact may never be "established" or found by *less* than a preponderance of the evidence, although "occasionally the burden is a *heavier* one." 3 Davis, Administrative Law Treatise, 255–56 (1980) (emphasis added). *See also*, Schwartz, Administrative Law, 360–62 (1984).

■ Concerning the ultimate facts inferred by the agency from its findings of basic facts, a reviewing court is similarly limited to the inquiry of whether the agency's findings of basic fact reasonably support its findings of ultimate fact—in the present context, "the required ultimate statutory findings of inadequacy of the services and facilities of existing carriers and a genuine public need for the proposed service...." *Miller v. Railroad Commission*, 363 S.W.2d 244, 245–46 (Tex.1962).

■ To avoid the absurdity apparent on the face of art. 911b, § 5a(d), if it be interpreted literally, we construe the expression "substantial evidence" to mean "preponderance of the evidence," the only reasonable meaning possible to be inferred in the context of the entire statute. *Lunsford v. City of Bryan*, 156 Tex. 520, 297 S.W.2d 115 (1957); *Wortham v. Walker*, 133 Tex. 255, 128 S.W.2d 1138 (Tex.1939).

*Requisites of the Final Order.* In particular reference to specialized-motor-carrier proceedings, § 5a(d) establishes the following requirement governing the final orders by which such proceedings are adjudicated:

> The order of the Commission granting or denying the application and the certificate issued thereunder shall be void unless the Commission shall *set forth* in its order *full and complete findings of fact* on the issues of adequacy of the services and facilities of the existing carriers, and the public need for the proposed service.

(emphasis added). In § 6(d), there is a similar provision, in substantially the same language, relative to a special kind of specialized-motor-carrier proceeding: a proceeding wherein the applicant proposes to transport "livestock, mohair, wool, milk, livestock feedstuff, household goods, used office furniture and equipment, oil field equipment, timber in its natural state, farm machinery and grain." The same anomaly relative to "substantial evidence" is repeated in this section.

The foregoing statutory requirement—that the Commission set forth in its final order a "full and complete" set of findings of basic fact—has been construed and enforced in several cases. *See Auto Convoy v. Railroad Commission,* 507 S.W.2d 718 (Tex.1974); *Morgan Drive Away v. Railroad Commission,* 498 S.W.2d 147 (Tex. 1973); *Miller v. Railroad Commission, supra; Railroad Commission v. Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815 (1958); *Thompson v. Hovey Petroleum Co.,* 149 Tex. 554, 236 S.W.2d 491 (Tex. 1951). The best discussion of the requirement is that contained in the *Miller* opinion by Judge Calvert:

> There is purpose in the statute. One purpose no doubt is to restrain any disposition on the part of the Commission to grant a certificate without a full consideration of the evidence and a serious appraisal of the facts. Another is to inform protestants of the facts found so that they may intelligently prepare and

present an appeal to the courts. Still another is to assist the courts in properly exercising their function of reviewing the order. If an order is to accomplish these purposes, it must contain findings of basic facts as distinguished from mere factual, or mixed factual and legal, conclusions. *Findings of basic facts cannot be presumed from findings of a conclusional nature.*

> \*      \*      \*      \*      \*      \*

> This court has neither the right nor the ability to lay out a precise form of findings to be made by the Commission. They should be such that a court upon reading them can fairly and reasonably say that they either do or do not *support the required ultimate statutory findings* of inadequacy of the services and facilities of existing carriers and a genuine public need for the proposed service....

*Miller, supra,* 363 N.W.2d at 245–46 (emphasis added). The emphasized portions of the foregoing quotation dictate two imperatives: (1) the set of basic fact findings stated in the Commission's order must be such as to reasonably support the Commission's determination of the ultimate fact findings required by art. 911b, the nature of the basic fact findings being dependent upon the nature of each case and the evidence adduced; and (2) one may not presume that the Commission found any basic fact merely because it determined one way or another on the findings of ultimate fact required by art. 911b.

Before 1976, only one other statute required an administrative agency to set forth in its final adjudicative order the basic or underlying facts from which the agency inferred its findings of ultimate fact. Texas Savings and Loan Act, Tex. Rev.Civ.Stat.Ann. art 852a, § 11.11(4) (1964). In 1976, however, with the enactment of the Texas Administrative Procedure and Texas Register Act, the following provision found in § 16(b) of that statute became applicable to the final orders of the Texas Railroad Commission and all other

administrative agencies that adjudicate contested cases under APTRA:

A final decision must include findings of fact and conclusions of law, separately stated. Findings of fact, *if set forth in statutory language*, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

(emphasis added). In *Texas Health Facilities Commission v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446 (Tex.1984), the Supreme Court construed the phrase we have emphasized in the foregoing quotation. That Court held that APTRA § 16(b) required "a concise and explicit statement of the underlying facts," supportive of the agency's findings of ultimate fact, in two circumstances only: (1) "when the ultimate fact finding embodies a mandatory fact finding set forth in the relevant enabling act"; and, (2) when the ultimate fact findings "represent the criteria that the Legislature has directed the agency to consider in performing its function." 665 S.W.2d at 451. We need not discuss any conflict between APTRA § 16(b) and art. 911b, § 5a(d) that might result from the Supreme Court's limiting construction of the former statute in *Charter Medical. See* Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases*, 16 Texas Tech L.Rev. 475, 491–512 (1985). The Commission's findings in the present case fail to meet even the more restrictive scope of APTRA § 16(b) as that statute was construed in the *Charter Medical* opinion.

■ We arrive then at our conclusions regarding what the Commission's final order must contain in its decision in contested cases looking to the issuance of a specialized motor carrier permit. First, the three ultimate facts of public necessity, public convenience, and the inadequacy of the facilities and services of existing carriers must be determined, assuming the applicant has made a prima facie case as to the first two. These are the sole determinations concerning which the Legislature has established, in art. 911b, § 4(e), a particular allocation of the burden of producing evidence and persuasion. Consequently, we conclude that the Legislature intended that these three legal concepts should *include*, at minimum, the Commission's determination relative to the other, subsidiary factors that the Legislature directed the Commission to consider in contested cases looking to the issuance of a specialized motor carrier certificate, namely: highway conservation and safety; the probable permanence and quality of the proposed service; the financial ability and responsibility of the applicant and its organization and personnel; the character of the applicant's vehicles and the character and location of the proposed terminals and depots; the experience of the applicant in transporting property and the character of the bond or insurance proposed to be given to insure the protection of the public; the nature and character of the applicant's equipment proposed to be used and the character of the tonnage to be hauled; and, the demand for or need of additional service. Art. 911b, §§ 8, 9 and 13a. We conclude the Legislature intended these to be essential considerations leading to the Commission's determination of the three ultimate facts of public convenience, public necessity, and inadequacy of the existing facilities and services. The terms of §§ 8, 9 and 13 of art. 911b make it exceedingly clear that these subsidiary factors "represent the criteria that the Legislature has directed the agency to consider in performing its function" in adjudicating contested cases looking to the issuance of a specialized motor carrier permit, in the words of the *Charter Medical* opinion. (As indicated in footnote two, the factors of highway conservation and safety may constitute an exception arising from case law developed before *Charter Medical*.) Under that decision, then, the Commission must determine these subsidiary factors and its determinations must be reasonably supported by findings of underlying or basic fact set forth in the Commission's final order.

*Miscellaneous Provisions.* Section 5a(d) also incorporates other provisions of art. 911b not heretofore mentioned, namely: §§ 11 and 12 establishing various requirements for hearings; § 13 dealing with the matter of a carrier's giving a bond or insurance undertaking; § 14 covering the mat-

ter of complaints filed against carriers; and § 15 providing for the issuance of process and other matters pertaining to witnesses. They do not require discussion in the present appeal.

## THE COMMISSION'S FINAL ORDER IN THE PRESENT CASE

In its final order authorizing the certificate requested by the applicant, the Commission adopted the findings of fact and conclusions of law recommended by the hearing examiner in his proposal for decision. We have summarized in a footnote these findings of fact.[3] Based upon those findings, the following conclusions of law or findings of ultimate fact were made:

There exists a public necessity to transport mobile homes between Hidalgo, Willacy, and Cameron Counties.

The public convenience will be promoted by granting the application ... to trans-

3. We shall here quote and paraphrase the findings of fact adopted and incorporated by the Commission in its final order:

**"Applicant's Fitness"**

1. Applicant holds an installer's license and owns mobile-home parks and mobile-home dwellings.
2. Applicant "retails, installs, transports, and rents mobile homes" and park sites.
3. Applicant's "owners" have a net worth of approximately $3,000,000 and "are prepared to use their personal assets to provide capital for the applicant."
4. Applicant has attempted by advertising to attract senior citizens to be tenants in its mobile-home park located in Combes, Texas.
5. Applicant proposed to transport mobile homes from Willacy, Hidalgo, and Cameron Counties to all points in Texas and vice versa.
6. Applicant owns three "toters" and employs personnel to transport and install mobile homes.

**"Shipper Support"**

7. Andreas Cantu, a witness, installs mobile homes in the Brownsville area.
8. Applicant has transported all the mobile homes that Mr. Cantu has caused to be moved for his installation customers.
9. Existing carriers Professional Mobile Home Transport ("Professional") and Adair Mobile Home Transport (Adair) "are not geographically close to provide service to Mr. Cantu."
10. Joe Sanders, a witness, "sold mobile homes for Heritage Homes, Harlingen, between February and August, 1983, during which period Heritage Homes sold about 24 homes, and Professional handled 12 to 14 of the moves."
11. One of the movements in April, 1983, was the shipment of a used home from San Benito to a farm near Los Fresnos, which was delayed by Professional "a week to ten days."
12. During April to August 1, 1983, Sanders telephoned Professional and had to wait for another call from Professional before pickup of mobile homes could be scheduled.
13. In 1983, Professional did not show up ten percent of the time to pick up homes for Heritage Homes.
14. Harlingen National Bank finances mobile homes for individuals and dealers.
15. The bank repossesses some mobile homes which must be returned to Harlingen or sold at auction in the cities where they are repossessed.
16. The bank's present and primary interest is for transportation service within Cameron, Hidalgo, and Willacy Counties.
17. Harlingen National Bank has caused as many as four mobile homes to be picked up in one day.
18. At the date of the hearing, the bank had 75 risky loans on mobile homes in Cameron, Hidalgo, and Willacy Counties; 25 were nearly ready to be picked up and one might be returned to Harlingen.
19. The bank has used applicant to move mobile homes on an inter-city (sic) basis.
20. The number and size of mobile-home parks has increased in and around Harlingen within the past five years.
21. This growth is demonstrated by the development of seven mobile-home parks (specified in the finding) and one unidentified park in San Benito, Texas.
22. Mobile homes are being increasingly installed in Combes, Texas.
23. In the winter, with the influx of winter Texans to the Rio Grande Valley, there is an increase in moves within the Valley.
24. Adair Mobile Home Transportation (Adair) in Alamo, Texas, has Commission authority to transport mobile homes between Starr, Hidalgo, Willacy, and Cameron Counties.
25. Adair has a terminal in Alamo, Texas, from which it operates two mobile home "toters."
26. Adair is in no position to open a terminal in Port Isabel, Cameron County, Texas.
27. Within six months before the hearing, Adair had asked some customers to postpone movements a day or two before transporting their mobile homes.
28. Of 12 mobile home movers listed in the yellow pages of the Rio Grande Valley Telephone Directory, four have certificates of authority to operate. Adair and Professional list a Rio Grande Valley address: Morgan Drive Away lists a telephone and address in San Antonio; and NTC of America lists a telephone and address in Corpus Christi, Texas.

port mobile homes, limiting the service to movements between points within Hidalgo, Willacy, and Cameron Counties.

[The applicant] is fit, ready, willing, and able to provide the service in the territory described ... above.

The protestants have failed to prove that the services and facilities of the existing carriers serving between points in Hidalgo, Willacy, and Cameron Counties are adequate.

Again following the hearing examiner's recommendation, the final order specifies that the authority granted shall extend to the following commodities:

**"Protestant's Presentation"**

29. NTC of America (NTC) is authorized to transport mobile homes throughout all points in Texas.

30. NTC assigns three trucks at its terminal in Corpus Christi, its terminal closest to the Valley.

31. NTC has never had a terminal in Harlingen or the Valley.

32. NTC daily transports mobile homes into the area of Hidalgo, Cameron, and Willacy Counties.

33. NTC trucks leave the area without loads because there is no outbound traffic.

34. NTC desires to transport mobile homes outbound from the Valley.

35. From January 1 to September 1, 1983, NTC was tendered on shipment of a mobile home from the points here involved, the shipment being from McAllen to Laredo, Texas.

36. NTC will accept collect calls in Corpus Christi, but it does not advertise the fact.

37. NTC advertises in Texas through giving away baseball caps, pen sets, and scratch pads; through the use of billboards; and through participating in mobile-home shows.

38. NTC solicits transportation business from mobile-home parks and mobile-home factories; there are none of the latter in the Valley.

39. NTC has unsuccessfully quoted estimates for the movement of mobile homes from the Valley.

40. Professional Mobile Home Transport is authorized to transport mobile homes from all points in Cameron, Hidalgo, Starr, and Willacy Counties to all points in Texas and vice versa.

41. Professional has five drivers, twelve installers, four "toters," and terminals in La Feria, Cameron County, and Weslaco, Hidalgo County, Texas.

42. Professional advertises and solicits the business of transporting mobile homes.

43. Professional is transporting mobile homes between the valley and other Texas points.

(1) mobile homes; (2) equipment, materials and supplies incidental to the use and occupancy of mobile homes....

## HOLDINGS AND DISCUSSION

Appellant brings 12 points of error. Several of them constitute attacks upon an asserted insufficiency of the Commission's findings of basic fact to reasonably support the agency's findings of ultimate fact relative to public necessity, public convenience, and the adequacy of the facilities and services of existing carriers. Interwoven with this contention, however, appellant argues that the evidence is insufficient reasonably

The proposal for decision also includes the hearing examiner's reasoning in reaching the ultimate facts he recommended. While the Commission did not adopt this reasoning, we believe it fair and useful to summarize this part of the proposal for decision.

The examiner took note of the undisputed evidence that the applicant had previously transported mobile homes illegally, that is to say, without official authority evidenced by a certificate of convenience and necessity. Indeed, the applicant had done so even after filing his application in the present proceeding. Nevertheless, in the examiner's view, the applicant "was apologetic and contrite...." The examiner also noted the applicant's violation of certain of the Commission's regulations and unspecified statutory provisions relating to advertising. The examiner concluded from the evidence that an additional authorized carrier operating from Willacy, Cameron, and Hidalgo Counties to points outside those counties, and from outside points to those counties, was "not in the public interest" owing to an abundance of existing carriers willing and able to provide adequate services and facilities in that regard. On the other hand, the examiner concluded that this was *not* the case regarding the transportation of mobile homes between points *within* the three-county area. There existed a public need for this character of service because, generally speaking, existing carriers were too remote to furnish reasonably satisfactory service. Accordingly, the examiner recommended that the applicant's authorized service be limited to service between all points *within* the three counties, as opposed to his application to provide the service *to* those counties from all points in Texas and to all points in the State *from* those counties.

to support the findings of basic fact themselves. We need not discuss these matters extensively, however, for we conclude that appellant must succeed on his complaint that the Commission's findings of basic fact do not reasonably support the agency's determination regarding the applicant's "fitness" to provide the service he proposed. We hold in consequence that appellant's substantial rights have been prejudiced because the Commission's "findings, inferences, conclusions" and resulting decision are:

(1) in violation of ... statutory provisions;

\* \* \* \* \* \*

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion....

APTRA § 19(e). For the purposes of the following discussion, we shall employ a theory that an agency's reasoning from its findings of basic fact to its findings of ultimate fact is judicially reviewable under the "substantial evidence rule" implicit in APTRA § 19(e)(5), as opposed to the more accepted theory that such reasoning is judicially reviewable under the "arbitrary or capricious or ... abuse of discretion" standard of APTRA § 19(e). *See* Powers, *supra*, at 490–93. The "substantial evidence" analysis is dictated by the Supreme Court's holding in the *Charter Medical* decision. 665 S.W.2d at 452. The propositions stated in APTRA § 19(e)(1), (3), and (4) may also be employed as grounds for reversal in the present case because the Commission failed to comply with various provisions of art. 911b referred to below.

■ As mentioned above, the Commission determined that the applicant was "fit, ready, willing, and able to provide the service" proposed in his application for a certificate. There is no provision in art. 911b

that explicitly directs the Commission to make such a determination in those very terms before it may issue a certificate; however, we must judge the agency order on the basis *upon which it purports to rest* and not upon what we might imagine is an adequate or more proper basis. *Morgan Drive Away, Inc. v. Railroad Commission of Texas*, 498 S.W.2d 147 (Tex. 1973). The latter would amount, of course, to a judicial usurpation of the agency's authority. *Bowman Trans. v. Arkansas-Best Freight*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); *Allied Chem. v. Railroad Commission*, 660 S.W.2d 124, 132 (Tex.App.1983, writ ref'd n.r.e.); *see SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1946).

We believe the Commission was unquestionably within its powers in making an applicant's "fitness" a determination upon which its application depended. That criterion is reasonably inferrable from art. 911b, § 9, particularly, where the Commission is instructed by the Legislature to "give weight and due regard to" certain specified factors "in determining whether or not a certificate should be issued...." These factors are: (1) the probable permanence and quality of the proposed service; (2) the financial ability and responsibility of the applicant and its organization and personnel; (3) the character of vehicles and the character and location of the depots and terminals proposed to be used; and (4) the experience of the applicant in transporting property and the character of the bond or insurance proposed to be given to ensure the protection of the public. As mentioned above, any determination relative to these factors must itself be supported by findings of underlying fact because the Legislature has explicitly directed the Commission to consider these factors as criteria in determining whether to issue a specialized motor carrier certificate.

In footnote three, we have set out all the findings of basic fact reached by the Com-

mission. The first six are the sole findings that reasonably may be viewed as "support" for the Commission's determination that the applicant was "fit, ready, willing, and able to provide the" proposed service. Appellant contends the Commission failed to make underlying findings regarding the criteria specified in art. 911b, § 9 and that the six findings that were made are insufficient to enable us fairly and reasonably to say that they support the "fitness" determination just mentioned. *Miller v. Railroad Commission, supra,* 363 S.W.2d at 246. We agree.

The six findings of basic fact apparently declare the Commission's determination, from the evidence, that the applicant's "financial ability and responsibility" are satisfactory for regulatory purposes. They do not, however, purport to declare the agency's determination as to the other matters dictated by art. 911b, § 9 because they either omit entirely to mention a statutory criterion or fail to supply underlying facts that reasonably support the agency's determination on such a criterion. For example, findings one and two logically may be viewed as dealing with and supporting, perhaps, a favorable finding as to the applicant's "experience ... in transporting property" (shown under the undisputed evidence to consist partly in the applicant's *illegal* transportation of mobile homes). But there is no finding on the criterion itself. Moreover, none of the six findings even remotely suggest that the Commission considered and ascertained the applicant's satisfaction of the other criteria specified in art. 911b, § 9, such as the probable permanence and quality of the service proposed by the applicant and the character of bond or insurance required to ensure the public's protection. Again, we emphasize three propositions: (1) art. 911b, § 9 is quite clear and explicit in its requirement that the Commission *consider* these statutory criteria "in determining whether or not a certificate should be issued," that is to say, in the certification or licensing process; (2) because § 9 unquestionably directs the Commission to *consider* these criteria, APTRA § 16(b) requires that the agency's determinations relative to them be supported by findings of underlying fact, under the Supreme Court's construction of § 16(b) in *Charter Medical;* and (3) we are forbidden to *presume* from the Commission's decision or any finding of ultimate fact that the agency found any basic fact in support thereof, as stated in Miller v. Railroad Commission, *supra.*

Because appellant makes no complaint of the omission, we need not concern ourselves with the fact that the Commission's final order omits entirely to make any determination or basic fact findings relative to highway conservation and safety and the applicant's equipment—matters that the Commission is bound to determine in the certification process under art. 911b, §§ 9 and 13a, incorporated by reference in § 5a(d).

■ For want of the determinations and findings mentioned in the foregoing paragraphs, however, we sustain appellant's contention regarding the Commission's determination that the applicant was "fit, ready, willing, and able to provide the" proposed service. We therefore reverse the judgment below and the Commission's final order, remanding the case to the agency.